**UNITED STATES of America, Appellant,**

v.

**Stanley S. NEUSTADT and Rose-Barbara Y. Neustadt, Appellees.**

**No. 8071.**

United States Court of Appeals
Fourth Circuit.

Argued May 31, 1960.
Decided Aug. 19, 1960.

Morton Hollander, Atty., Dept. of Justice, Washington, D. C. (George Cochran Doub, Asst. Atty. Gen., Joseph S. Bambacus, U. S. Atty., Richmond, Va., Samuel D. Slade and William A. Montgomery, Attys., Dept. of Justice, Washington, D. C., on brief), for appellant.

Lawrence J. Latto, Washington, D. C., for appellees.

Before SOPER and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

SOPER, Circuit Judge.

The question in this case is whether the purchaser of a single residence property covered by a mortgage under § 203 (a) of the National Housing Act as amended, 12 U.S.C.A. § 1709(a), is entitled under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., to recover damages occasioned by the negligence of an agent of the Federal Housing Commissioner in making an appraisal of the property under the provisions of the statute and the regulations issued pursuant thereto. See 12 U.S.C.A. § 1709(b) (2) and 24 C.F.R. § 200.4(b). The United States does not deny that the appraisal was faulty or that the purchasers were injured thereby but defends on the ground that the plaintiffs' claim arises out of misrepresentation which is excluded from the coverage of the Tort Claims Act by 28 U.S.C. § 2680(h).

The property is located in Alexandria, Virginia. The former owners, in anticipation of selling it, caused an approved lender to make application under 12 U.S.C.A. § 1709(a) of the Act for a conditional commitment to insure the mortgage and pursuant thereto the property was inspected by an FHA appraiser, who reported that the property was eligible for mortgage at the appraised value of $22,750. The plaintiffs as prospective purchasers were apprised of this fact. Thereupon a contract of sale was executed conditioned upon the purchasers obtaining a loan secured by an FHA mortgage in the sum of $18,800. Therein the sellers agreed to furnish the plaintiffs a written statement of the appraised value as so determined, and this was done upon the settlement date when the purchasers took title to the property.

The purchasers took possession of the house and several days later substantial cracks appeared in the interior walls and ceilings in all of the rooms, as well as in the cinder blocks in the basement walls. It was then found by FHA officials that cracks were appearing in the exterior walls, and that the one-story sun porch was separating from the east wall, and that the foundations were settling in an unusual manner. These conditions were found to have been caused by the character of the subsoil, which contained a type of clay that quickly disintegrates when exposed to water; and it was ascertained that the underpinning of the foundations would require the expenditure of several thousand dollars.

The pending case was then brought and tried before the District Judge without a jury, who rendered a verdict in favor of the plaintiffs for $8000. The judge called attention to the amendment to the statute by the act of Congress of August 2, 1954, codified in 12 U.S.C.A. § 1715q, whereby the seller of a dwelling approved for mortgage insurance under the statute is required to agree to deliver to the purchaser prior to the sale a written statement setting forth the

amount of the appraised value of the property as determined by the Commissioner. The Judge held that the statute as amended imposes upon the United States the duty to appraise the property with ordinary care and diligence as a gauge of the fairness of the price to be paid by the purchaser and that neglect of this duty makes the United States liable to the purchaser. He was of the opinion that the appraisal involves not merely a representation on the part of the United States but the performance of a positive act by the government as a direct and immediate service to the purchasers. He found that in this case the plaintiffs, in good faith, relied upon the appraisal in consummating the purchase and, since serious structural defects in the house subsequently appeared which reasonable care by a qualified appraiser would have discovered, the negligence of the government to perform its statutory duty entitled the plaintiffs to recover the direct loss of $8000 resulting therefrom. Accordingly, a judgment for this amount was rendered against the United States.

The United States on this appeal relies upon the exclusionary section of the Tort Claims Act, which declares in 28 U.S.C. § 2680(h) that the provisions of the statute shall not apply, inter alia, to any claim rising out of misrepresentation or deceit. It has been uniformly held that "misrepresentation" in this context, since it appears in the act in juxtaposition to "deceit", means negligent as well as wilful misrepresentation.[1] We are in accord with this view especially as it is reasonable to suppose that Congress intended to exempt the Government from liability for misinformation carelessly given by its agents to the public in the wide field of its manifold activities.[2] The Government therefore contends that it has no liability in the pending case, and in support of its position cites a number of cases in the federal courts, analyzed in footnote,[3] in which,

[1.] Jones v. United States, 2 Cir., 207 F. 2d 563, certiorari denied 347 U.S. 921, 74 S.Ct. 518, 98 L.Ed. 1075; National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, 275–276, certiorari denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108; Clark v. United States, 9 Cir., 218 F.2d 446, 452; Miller Harness Co. v. United States, 2 Cir., 241 F.2d 781; Anglo-American & Overseas Corp. v. United States, 2 Cir., 242 F.2d 236; Hall v. United States, 10 Cir., 274 F.2d 69.

2. In National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, 276, the court said that the intent of the section is to except from the Act cases where mere "talk" or mere failure "to talk" on the part of a government employee is asserted as the proximate cause of damage sought to be recovered from the United States.

3. In Anglo-American & Overseas Corp. v. United States, D.C.S.D.N.Y., 144 F. Supp. 635, affirmed 2 Cir., 242 F.2d 236, a merchant purchased certain lots of imported tomato paste, relying upon the fact that it had been admitted into the United States after examination by agents of the United States pursuant to the Pure Food, Drug and Cosmetics Act. Later the merchant endeavored to sell the goods to the United States but they were rejected and condemned because they were found to be adulterated. It was held that the plaintiff could not recover because the duty imposed upon the United States under the statute was owed to the consumers and not to the dealer and, also, because the plaintiff's injury grew out of misrepresentation within the exception of the Tort Claims Act which was applicable, although the misrepresentation flowed from negligence in testing the goods.

In Hall v. United States, 10 Cir., 274 F. 2d 69, the plaintiff, who was engaged in the cattle business in New Mexico, complained that he was injured when agents of the United States Department of Agriculture engaged in testing livestock for disease informed him that his cattle were diseased, causing him to sell them for less than their market value, whereas in fact there were no diseased cattle in the herd. It was held that the plaintiff could not recover because the loss was caused, not by the faulty testing of the herd, but by the misrepresentations of the government agents. Whether the duty to inspect was owed to the general public or to the plaintiff was not considered.

In Jones v. United States, 2 Cir., 207 F.2d 563, certiorari denied 347 U.S. 921, 74 S.Ct. 518, the plaintiffs sued for loss incurred when they sold their stock in an oil company for less than it was worth

under varying circumstances, it has been exonerated from liability for damages caused by negligent misrepresentation of its agents. We can discern no clear line running through these cases which serves as a guide to the solution of the present controversy. In most of them liability could be based only upon misrepresentation by agents of the government since the actions complained of were carried on for the benefit of the public at large and not in the performance of a specific duty owed to the injured party, Clark v. United States, 9 Cir., 218 F.2d 446; Anglo-American & Overseas Corp. v. United States, 2 Cir., 242 F.2d 236; or the statute or contract governing the activity expressly exempted the government from liability for the acts of its agent, Jones v. United States, 2 Cir., 207 F.2d 563, certiorari denied 347 U.S. 921, 74

S.Ct. 518; National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263.

On the other hand, it has been held that if the government assumes a duty and negligently performs it, a party injured thereby may recover damages from the United States even though the careless performance of the duty may have been accompanied by some misrepresentation of fact. Thus in Otness v. United States, D.C.Alaska, 178 F.Supp. 647, a shipowner sued to recover for the loss of his vessel due to collision with a submerged channel light which the Coast Guard undertook to locate but negligently failed to find, whereupon it issued an erroneous bulletin that no part of the light remained above the bottom of the sea. It was held that although the bulletin contained a misrepresentation of facts, this

---

after they had asked the United States Geological Survey for information as to the ultimate recovery of oil to be expected from the company's lands and were told, as the result of a negligent estimate by an agent of the United States, that the expected recovery was far less than it turned out to be. It was held that the suit was based on misrepresentation, for which recovery was barred under the statute. Whether the government owed any duty to the plaintiffs was not discussed, but it was pointed out in the opinion of the District Judge, D.C., 120 F.Supp. 894, that the members of the geological survey are forbidden by the statute, 43 U.S.C.A. § 31, to execute surveys or examinations for private parties.

In Clark v. United States, 9 Cir., 218 F.2d 446, it was held that the United States was not liable for damages to persons and property caused by flood in the Columbia River, since the evidence showed no negligence on the part of the United States either in its precautions to prevent the flooding of lands or in the issuance of a bulletin to the public to the effect that the flood situation was not dangerous. The court added that even if the flood should have been foreseen and the bulletin was negligently issued, the government was not liable since the misrepresentation therein involved fell within the exception of the Tort Claims Act.

Again, in National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, certiorari denied 347 U.S. 967, 74 S.Ct. 778, 98 L.

Ed. 1108, the liability of the United States for dissemination by its agents of erroneous flood and weather reports was before the courts. It was held that the government was exonerated from liability for damages from flood waters by the express provision set out in the flood control act and that this provision was broad enough to bar recovery for damages caused by the negligence of government agents in circulating flood and weather reports; and it was also held that negligent conduct in the dissemination of erroneous reports was within the misrepresentation exception of the Tort Claims Act.

In Miller Harness Co. v. United States, 2 Cir., 241 F.2d 781, the plaintiff purchased from the United States certain surplus property described as saddle parts in the invitation to bidders wherein bidders were cautioned to inspect the property, and it was expressly stated that the government made no guarantee as to quantity, kind, character or description. The plaintiff being uncertain as to the character of the saddle parts, telephoned the custodian of the government depot and was told that stirrup irons and stirrup leathers were included in the item. Accordingly, the plaintiff bought the goods; but when they were delivered no stirrup parts or stirrup leathers were included and accordingly he brought suit for their reasonable value. Judgment went against him on the ground that his claim was based merely on misrepresentation.

did not bring the case within the exemption of the Tort Claims Act or absolve the United States from liability for the negligent performance of a duty which it had voluntarily assumed. In like manner, the United States was held liable under the Federal Tort Claims Act for the negligent operation of a lighthouse in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48, and for the negligent marking of a wreck in Somerset Seafood Co. v. United States, 4 Cir., 193 F.2d 631. In each case liability was based upon the negligent performance of a duty assumed by or resting upon the government. There was no discussion in either case of the statutory exemption of the United States for liability for misrepresentation but, as pointed out by the District Judge in the court below, misrepresentation was necessarily involved in the negligent marking of the wreck in one case and in the absence of notice of peril to the mariner in the other.

The record in the instant case discloses that the government owed a specific duty to the plaintiffs as purchasers of the property and that they suffered substantial loss from the careless manner in which the duty was performed. The scheme of the National Housing Act, 12 U.S.C.A. § 1709(a), under which the purchase was made endows the Federal Housing Commissioner with power to insure a mortgage on a single family residence property if the mortgage complies with certain statutory requirements and involves a principal obligation not in excess of specified fractions of the appraised value of the property, which are placed very high in order to aid a prospective buyer with limited capital to acquire a residence. Application for the insurance must be made by an approved financial institution and frequently is made in advance of the execution of the mortgage. On receipt of the application an appraisal of the property is made to determine whether it meets the standards prescribed by the Commissioner and to fix a valuation for insurance purposes. If the property is approved, a conditional commitment is made to the applicant wherein the Commissioner agrees to insure the property in an amount computed upon its appraised value provided it is found that the purchaser is financially able to carry the mortgage. Obviously the appraisal of the property is an important part of the process. To accomplish this the appraiser inspects the property to ascertain its condition and eligibility and, if it is found eligible, makes an appraisal based on its long-time economic value.

■■ This procedure was designed to effectuate the purpose of the Act, to encourage the construction of housing by giving aid to prospective purchasers, and at the same time to protect the government from a loss that would be incurred by insuring undesirable property. In 1954, the purpose of Congress to protect the purchaser was emphasized and further advanced by the addition to the statute of the amendment set out in 12 U.S.C.A. § 1715q referred to above. This Act directed the Commissioner to require the seller of residential property, covered by an approved mortgage under the statute, to deliver to the purchaser a written statement setting forth the amount of the appraised value as determined by the Housing Commissioner. The purpose of the new act to inform the purchaser of the value placed upon the property by government appraisal for his own guidance is clear upon the face of the enactment. If there were any doubt about it, it is made clear by the legislative history.

The Senate report upon the National Housing Act of 1954 contains a section entitled "The Protection of the Consumer" in which it was indicated that there was need for a change in the philosophy of the Federal Housing Administration in the administration of the statute, so that the agency, while keeping in mind the objectives of the Act to maintain a high limit of housing production and to protect the insurance fund and the mortgagee from loss, would recognize its responsibility to protect the public interest in general and the rights

of homeowners in particular, and at all times to regard it as a primary responsibility to act in the interest of the individual home purchaser and protect him to the extent feasible. See U.S.Code Congressional and Administrative News, 1954, p. 2726. The conference report on the measure emphasizes the same purpose. It pointed out that, notwithstanding the fact that there is no technical relationship between the FHA and the individual, it was the intent of Congress that the procedures of the administration should not be used exclusively for the protection of the government and its fund, and attention was drawn to the specific provision of the amended act which requires that the purchaser be given a written statement setting forth the FHA's appraised value of the property so that the purchaser may be informed as to the amount that would be warranted in making the purchase. 2 U.S.Code Congressional and Administrative News, 1954, p. 2828.

█ █ Thus, it is abundantly clear that the government owed a specific duty to the plaintiffs in this case even though there was no contractual relationship between them. The situation is similar to that considered by Judge Cardozo in Glanzer v. Sheppard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425, where it was held that a public weigher, who was employed by the seller of goods and overstated the weight of the merchandise, was liable in damages to the buyer who bought them on the faith of the weigher's certificate. It was pointed out in the opinion that the defendant was not held merely for careless words but for the careless performance of the act of weighing.

So in the pending case, the wrongful conduct complained of does not consist merely or chiefly in the communication to the plaintiffs whereby they were notified that the Housing Commissioner had appraised the property for mortgage purposes at $22,750, but primarily in the negligent appraisal itself whereby they were led to pay more for the property than it was worth. The government takes the narrow ground that the purchasers' loss was not occasioned by the negligent appraisal but by the misrepresentation in the government's report of the appraisal. The communication itself however was not, strictly speaking, a misrepresentation of fact, for it correctly reported that the Commissioner had appraised the property and placed a valuation upon it of $22,750, both of which statements were true. It cannot be denied, however, that there was an element of misrepresentation of fact in the government's conduct when the transaction is considered as a whole. The report sent to the purchasers purported to be and might fairly be accepted by them as an accurate appraisal of the value of the property carefully made so that in effect it amounted to a misstatement of fact. Hence it might form the basis of an action for misrepresentation under general common-law principles, for it is generally held that one who supplies information for the guidance of others in their business is liable for harm to those who rely upon the information if there has been negligence in obtaining and communicating it, and the person harmed is one for whose guidance the information was supplied. Restatement of Torts, § 552; Prosser on Torts, p. 543.

It does not necessarily follow, however, that the case falls within the exemption of the Tort Claims Act, since it involves not only misrepresentation but also negligent performance of a definite duty owed to the plaintiffs. The real question is whether it was the intent of Congress to absolve the government from liability in every case in which misrepresentation plays merely a part. Misrepresentation, as Prosser shows, runs all through the law of torts and there are many types of wrongful conduct in which there are elements of misrepresentation that are usually grouped under categories of their own. Thus, as the author says (p. 520):

" * * * A great many of the common and familiar forms of neg-

ligent conduct, resulting in invasions of tangible interests of person or property, are in their essence nothing more than misrepresentation, from a misleading signal by a driver of an automobile about to make a turn, or an assurance that a danger does not exist, to false statements or non-disclosure of a latent defect by one who is under a duty to give warning. In addition, misrepresentation may play an important part in the invasion of intangible interests, in such torts as defamation, malicious prosecution, or interference with contractual relations. In all such cases the particular form which the defendant's conduct has taken has become relatively unimportant, and misrepresentation has been merged to such an extent with other kinds of misconduct that neither the courts nor legal writers have found any occasion to regard it as a separate basis of liability."

In view of this situation we do not think that the government is necessarily absolved from liability in every case of wrongful conduct on its part which incidentally embraces misrepresentation. It is abhorrent to common sense to hold that the government can relieve itself from liability for neglect of duty owed to an individual merely by telling him falsely that the duty has been faithfully performed; and it cannot be supposed that Congress had any such idea in mind when it included "misrepresentation" among the exceptions to the statute. Quite clearly the gist of the offense in this case was the careless making of an excessive appraisal so that the home seeker, whom the Commissioner was obligated to protect, was deceived and suffered substantial loss. This was the gravamen of the offense to which the report of the Commissioner was merely incidental. Accordingly, the judgment of the District Court is affirmed.

Affirmed.