BUILDERS CORPORATION OF AMER-
ICA, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18315.

United States Court of Appeals
Ninth Circuit.

Aug. 7, 1963.

Alvin Landis, Sacramento, Cal., Maurice J. Hindin, Beverly Hills, Cal., and Harry B. Seelig, Los Angeles, Cal., for appellants.

Cecil F. Poole, U. S. Atty., and Robert N. Ensign, San Francisco, Cal., for appellee.

Before CHAMBERS, BARNES, and KOELSCH, Circuit Judges.

BARNES, Circuit Judge.

Chapter 171 of Title 28 United States Code, and specifically Section 2674 thereof, provides in material part:

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances * * *."

Section 2680(a) of Title 28 United States Code, provides certain exceptions to the liability created by the entire Chapter 171 of Title 28 United States Code. Section 2680 reads, in material part:

"The provisions of this chapter * * * shall not apply to—

"(a) Any claim * * * based upon * * * the exercise or performance or the failure to exercise or perform a discretionary function

or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

By virtue of the same section (2680), if such discretionary function or duty is involved, no jurisdiction exists in the federal courts under § 1346(b) of Title 28 United States Code, to hear this claim.[1]

■ The waiver of the sovereign right created by the statutes above mentioned, did not create new causes of action where none existed before, nor did it foist novel and unprecedented liabilities upon the federal government. National Mfg. Co. v. United States, 8 Cir. 1954, 210 F.2d 263, certiorari denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108.

■ The rule of liberality of construction, in favor of the exceptions, applies. Mid-Central Fish Co. v. United States, W.D.Mo.1953, 112 F.Supp. 792, 8 Cir. 1954, 210 F.2d 263, certiorari denied, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108.

■ The exceptions are not to be nullified through judicial interpretation, since Congress clearly delineated the areas in which it did not intend to forfeit its immunity from suit. Toledo v. United States, D.Puerto Rico 1951, 95 F.Supp. 838, Hernandez v. United States, D.Hawaii 1953, 112 F.Supp. 369.

■ Acts of a governmental nature were never intended to be within the scope of the liability created. Dalehite v. United States, 1953, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, rehearings denied, 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 362, 346 U.S. 880, 74 S.Ct. 117, 98 L.Ed. 386, 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078; Wheeldon v. United States, N.D. Cal.1960, 184 F.Supp. 81.

With the applicable law in mind we turn to the case before us, and the specific facts involved. We find them adequately, fairly and accurately stated in the memorandum opinion of the district court. We use and adopt a large portion of such memorandum opinion in the margin.[2]

1. Section 1346(b) of Title 28 United States Code, reads:
."(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

2. "This is an action to recover damages from the United States of America under the provisions of the Federal Tort Claims Act (Title 28 U.S.C. §§ 1346(b) and 2671 et seq.). The gist of the complaint is that certain Government agents failed and refused to perform obligations which the Government had assumed by virtue of contracts and commitments of certain agencies, in connection with certain dwelling units constructed by plaintiffs adjacent to the Sierra Ordnance Depot, a military installation of the United States, near Herlong, California. The complaint is in two counts. The allegations are substantially the same in both counts, except that in Count I, the defendant (the Government, through its agents and employees) is charged with wilful conduct, whereas in Count II, the defendant is charged with negligent conduct. Trial has been had on the issues raised by plaintiffs, and the Court is now called upon to resolve those issues.
"The Sierra Ordnance Depot is located in a desolate and isolated area in the northeastern part of California. Prior to any of the activities which resulted in this action, a housing shortage existed at the Depot, which allegedly threatened to impede the effective operation of the Depot. Because of this shortage, negotiations were carried on between the Department of Defense, Federal Housing Administration (FHA), and Housing and Home Finance Agency (HHFA, also a Federal agency) to obtain construction of some 456 dwelling units to house civilian and military personnel employed at the Depot. These units had originally been requested by the Commanding Officer of the Depot, and the request had

The district court then considered the three communications between the Commanding General of the Sixth Army and the Commanding Officer of the Depot,

been approved by the Headquarters of the Sixth Army (his superiors) and by FHA. These negotiations were carried on pursuant to the authority of the National Housing Act of 1934 (Title 12 U.S.C. § 1702), and of the Act of August 8, 1949 (Title 12 U.S.C. § 1748 et seq.) which required that the investment risks in such projects be undertaken by private enterprise.

"The negotiations culminated in the issuance by the Defense Department, on October 24, 1951, of a certification to FHA that 125 units were necessary to provide adequate rental housing for Depot personnel (both civilian and military) ; that the Depot was deemed a permanent installation ; and that there was no present intention to substantially curtail activities at the Depot. The Depot Commanding Officer immediately repeated his request for an additional 300 units, based on prior study which had indicated that there were some 500 employees eligible for such housing. This request was denied, on the basis of Defense Department policy precluding a supplemental certification until the initial project was 25% or more completed. Since the need for housing was urgent and immediate, however, an additional 150 units were subsequently programmed by HHFA.

"Thereafter, pursuant to statutory authority, FHA agreed to insure a mortgage on the original 125 units, in the amount of $1,113,700. Plaintiff Herlong Sierra Homes, Inc. (hereinafter Herlong) filed application, received approval, and undertook the construction of the original 125 units. A mortgage loan was secured from Manufacturers Trust Company of New York, refinanced by Manhattan Savings Bank of New York, and secured by a mortgage on the dwelling units to be constructed by Herlong. These units were authorized under Title VIII of the National Housing Act (the "Wherry Act"), and were completed and ready for occupancy in January, 1954 (having been completed in late 1953). Construction of these units was in accordance with specifications issued and approved by the Department of the Army and FHA, and Herlong agreed to reserve the completed units for rent to the personnel of the Depot (although apparently there was nobody else around in the area anyway). Rents were to be established by the Defense Department and FHA. During the period from June, 1954, to June, 1955, monthly

costs in connection with the Title VIII units amounted to approximately $9,000.

"Plaintiff, Builders Corporation of America, (hereinafter Builders) pursuant to a commitment from FHA to insure a mortgage of $1,261,300 for the 150 dwelling units programmed by HHFA, undertook construction of those units, also in accordance with specifications issued and approved by the Defense Department and FHA. Builders acquired a mortgage loan from California Bank of Los Angeles, secured by mortgages on each of the dwelling units. These mortgages were purchased by Federal National Mortgage Association. The units themselves were built under the authority of Title IX of the National Housing Act. They were not started, however, until the Title VIII units were substantially completed, and were not completed until late in 1954. Starting in July 1954, monthly payments on these units approximated some $8,000.

"Probably the most important factor to plaintiffs in this program was the necessity that the projected units receive maximum occupancy. From a preliminary study, it was determined that 91% occupancy would be required in order for the units to meet their costs. In furtherance of this objective, a definite policy was set forth on the part of the Government, to encourage the maximum occupancy which would be required. Particularly was this policy enunciated on the part of the Government, in view of the fact that the Government had almost complete control of the sites, architecture, engineering, specifications, and inspections.

"The Title VIII units were completed in late 1953, but at that time very few of the personnel at the Depot moved into the new units. This appears to have been an indication that the anticipated necessity for the Title IX units had been gauged over-optimistically. In any event, certain communications followed, from the Commanding General of the Sixth Army to the Commanding Officer of the Depot, Colonel Leavitt. It is upon these communications that plaintiffs base their claims. The precise nature of the communications is in dispute between the parties. This is the crucial issue to the case.

The basis of plaintiffs' claims is that they relied upon the communications (which they term "orders") by expending additional monies in housing construction, which they would not otherwise

dated January 13, 1954, April 28, 1954 and July 10, 1954, respectively (each in evidence herein as Plaintiff's Exhibits Nos. 19, 21 and 30).[3] The trial judge ruled the first two letters contained no direct or specific orders and were merely statements of existing and future policy. We agree. The third letter the trial judge ruled was an order which directed certain things to be done, but which did not go so far as to order eviction of anyone from their then present housing. We need not pass on whether or not the July 10, 1954 letter was an order, in view of our disposition of other defenses. The trial judge ruled all the suggestions and orders had been followed and complied with by the officers so directed to act— that there was no "failure, either wilful or negligent, of government agents [specifically Colonel Leavitt and his staff] to carry out orders"—that all such orders so given were complied with.

We do not meet the question of what orders were given, or whether they were complied with. They all required Colonel Leavitt, in the chain of command he was then holding, to exercise some discretion. He was required by the position he held, for example, to notify his superior officer of the fourteen alleged deficiencies in the construction, as such deficiencies had been reported to him by those whom he was encouraging to use the housing accommodations. (Plaintiff's Ex. 25.) He was required, in his discretion, to determine whether certain key employees had to be available for telephone calls— day or night—and hence should not use the accommodations offered.

In Dalehite v. United States, supra, the Army's Chief of Ordnance was delegated to carry out the plan of producing a Fertilizer Grade Ammonium Nitrate (FG AN) by plants originally built in the United States to manufacture ammonium nitrate for explosives. The plants were operated by private companies, but under the supervision of the military. Army personnel were appointed for each camp. Negligence of all responsible for the production of FGAN was charged, resulting from the explosion of the French steamship Grandcamp—with the leveling of the town of Texas City, and the death of thousands. The trial court found in favor of the plaintiffs, the court of appeals reversed, and that latter judgment was affirmed. The Supreme Court held the findings did not establish a case, and "that as a matter of law the facts found cannot give the District Court jurisdiction of the cause under the Tort Claims Act." [4]

We come to the same conclusion with respect to the matter now before us, for the same reasons set forth in Dalehite v. United States, supra, 346 U.S. pp. 27–45, 73 S.Ct. pp. 963–973, 97 L.Ed. 1427.

Once the discretionary function is established as applicable to the facts—

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the

have done. With such a basis for their claims, it is obvious that there could have been, as plaintiffs themselves admit, no liability before those communications. The theory of plaintiffs' claims is that, by the communications, the Government voluntarily assumed a duty, and that reasonable care was required in its discharge."

3. Other letters containing similar language were sent to the Regional Director of the Housing and Home Finance Agency. Some were admitted in evidence; others refused admission.

4. 346 U.S. 15, at 24, 73 S.Ct. 956, at 962, 97 L.Ed. 1427.

time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." Dalehite v. United States, supra, 346 U.S. pp. 35–36, 73 S.Ct. pp. 967–968, 97 L.Ed. 1427.

■ The Commanding General here, in whatever he requested or ordered, was exercising his discretion in attempting to encourage a policy of full and maximum use of the housing facilities available. We think Colonel Leavitt exercised his best judgment in what he did and how he did it. But whether he did or not, whether he was negligent or not; whether he abused *his* discretion, are all immaterial. The sovereign immunity of the United States does not permit awards for damages arising out of acts performed by reason of the discretionary duty or function of "an employee of the government." [5]

The judgment in favor of the United States is affirmed.