**Harold HUBBARD, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 53089.

Supreme Court of Iowa.

Jan. 14, 1969.

Jesse, LeTourneau & Johnston, Des Moines, for appellant.

Richard C. Turner, Atty. Gen., Don R. Bennett, Special Asst. Atty. Gen., David S. Sather, Asst. Atty. Gen., for appellee.

MASON, Justice.

This is an action under chapter 25A, Code, 1966, Tort Claims Act, Acts of the Sixty-first General Assembly, against the State to recover for negligence in diagnosing plaintiff's herd of cattle as being infected with anaplasmosis when, in fact, they were not so infected.

Defendant's motion to dismiss was sustained on the ground trial court lacked jurisdiction of the subject matter of the action under this Act. Plaintiff has appealed.

During the fall of 1963 plaintiff owned a herd of 226 cattle on his farm in Clarke County. Shortly before October 14 a state veterinarian sent blood samples from 12 of the herd to the State Veterinary Diagnostic Laboratory, State University in Ames. The laboratory reported 5 samples as showing a positive reaction indicating a highly contagious and infectious disease known as anaplasmosis.

In accordance with state law and rules and regulations of the agriculture department that all reactor cattle be isolated at least 50 feet from any other cattle, the veterinarian quarantined the entire herd as being infected with anaplasmosis. Copy of regulations promulgated by the argiculture department furnished plaintiff provided quarantine would be released following two consequent negative tests on entire herd 60 days apart.

During October, December and January the veterinarian continued to send the laboratory blood samples from various animals of the herd. Reports of samples from the same animal were inconsistent in that a sample would be reported as being positive on one date, whereas a sample from the same animal would be reported as negative a few weeks later.

In early January 1964 plaintiff and the veterinarian sent one sample from 42 head reported as positive for the disease to Diagnostic Laboratory and one sample from

these same animals to Diamond Laboratory, Des Moines. Diagnostic Laboratory reported only 8 of the 42 samples were positive, while Diamond Laboratory, running tests on blood samples of the same animals taken the same day, showed only 2 possible reactors.

When confronted with proof of the inconsistent results of tests run by Diagnostic Laboratory, the agriculture department's Division of Animal Industry immediately lifted quarantine of plaintiff's herd.

June 30, 1967, after his claim for damages filed with state comptroller was denied by the appeal board, plaintiff instituted suit against the State, alleging veterinarians involved were agents or employees of the agriculture department acting on its behalf in the scope of their authority.

Plaintiff alleged defendant was negligent in one or all of the following:

"(a) It failed to employ recognized and appropriate tests to determine whether plaintiff's cattle herd had anaplasmosis.

"(b) It failed to use the skill of a diagnostic specialist in veterinary medicine, such as it professed to be, which special skill would have discovered that plaintiff's cattle herd did not have anaplasmosis.

"(c) It failed to carry out its tests in accordance with the recognized and appropriate procedures to determine whether plaintiff's cattle herd had anaplasmosis.

"(d) It failed to discover the discrepancies in the tests conducted by it although they were discoverable by reasonably diligent examination; and in failing to make sufficiently frequent examinations in that regard.

"(e) It failed to condemn said animals pursuant to the provisions of Chapter 163, 1966 Code of Iowa."

Plaintiff further alleged as a direct and proximate result of defendant's negligence his cattle herd, livestock and farm were rendered less valuable and he was forced to dispose of them at less than fair market value.

Defendant asserted in motion to dismiss plaintiff's petition alleged a cause of action over which the State had not waived its common law governmental immunity to suit; therefore, the court lacked jurisdiction of subject matter.

I. In his only assignment plaintiff asserts the trial court erred in sustaining defendant's motion to dismiss based upon lack of jurisdiction of subject matter.

Prior to March 30, 1965, the effective date of the Iowa Tort Claims Act (herein called the Act), our courts lacked jurisdiction over suits brought against the State and its agencies sounding in tort. In Montandon v. Hargrave Construction Co., 256 Iowa 1297, 130 N.W.2d 659, we held the doctrine of governmental immunity to tort actions was jurisdictional and affirmed the lower court's order sustaining the special appearance filed by defendant State agency.

The parties' contentions here present the issue whether plaintiff's petition asserts a claim specifically excluded from coverage under the Act by the "misrepresentation" clause of section 25A.14.

In support of trial court's ruling defendant argues the Act waives governmental immunity to claims sounding in tort only as to claims defined and to the extent provided in chapter 25A; exclusions in section 25A.14 are applicable to the subject matter of plaintiff's petition.

This section provides in pertinent part:

"The provisions of this chapter shall not apply to:

"1.    *    *    *

"2.    *    *    *

"3. Any claim for damages caused by the imposition or establishment of a quarantine by the state, whether such quarantine relates to persons or property.

"4. Any claim arising out of * * * misrepresentation, [or] deceit, * * *"

Section 25A.2(5) defines a claim for the purpose of the Act:

" 'Claim' means any claim against the state of Iowa for money only, on account of damage to or loss of property or on account of personal injury or death, caused by the negligent or wrongful act or omission of any employee of the state while acting within the scope of his office or employment * * *."

The State contends the Act excludes from coverage a claim arising out of misrepresentation or decit and also any claim for damages caused by imposition or establishment of a quarantine by the State. It argues this is such a claim because it arises out of testing of his cattle by the State agency on the basis it had negligently tested the livestock, had found and reported to plaintiff such livestock were diseased when in fact they were not, and as a result of such report plaintiff's herd was subjected to quarantine and sale at reduced prices.

Plaintiff, on the other hand, contends his claim is for negligence in improperly diagnosing his herd, not for misrepresentation. The negligence is said to be failure to exercise skill and care requisite to the duty to properly diagnose. He argues diagnosis of the herd was conducted by a series of completed tests; the results were compiled and given plaintiff; the results were not misrepresented, and the actionable tortious conduct is the State's negligence in conducting the tests which is clearly within the general provisions of the Act.

II. If we sustain the State's contention the cause is based on misrepresentation and thus within the exclusion, the case is governed by Montandon and the trial court was correct in its ruling. On the other hand, if plaintiff's contention that his cause is based upon negligence is upheld, the trial court was in error since the Montandon holding has been modified by the Act to the extent governmental immunity is waived under its provisions.

To some extent our Act is patterned after the federal Tort Claims Act and contains many of the same exclusions, including the "quarantine" exception in 28 U.S.C.A. § 2680(f) and the "misrepresentation" exception in 28 U.S.C.A. § 2680(h).

The "misrepresentation" exception of the federal statute has been construed by the Tenth Circuit Court of Appeals contrary to plaintiff's contention here in Hall v. United States (1959), 274 F.2d 69. The Hall decision was subsequently cited and strongly relied on by the United States Supreme Court in United States v. Neustadt (1961), 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614.

Hall v. United States, supra, was an action filed pursuant to the provisions of the federal Tort Claims Act. Plaintiff had alleged in substance that he was engaged in the cattle business in New Mexico; at all times material he owned approximately 333 head of livestock; defendant through its Department of Agriculture, Agricultural Research Division, Animal Disease Eradication Division, and its agents and employees was engaged in testing livestock for Brucellosis; they tested his herd; the results of the tests were made known to him; they revealed one or more of his cattle were suffering from the disease; and as a result of such report, his herd was subject to quarantine and a sale was made at reduced prices. Plaintiff had alleged that, in truth and in fact, the tests were negligently performed by defendant's agents; there were in fact no diseased cattle in his herd; and as a direct and proximate result of defendant's negligence, plaintiff was forced to dispose of his herd at less than fair market value.

The district court had predicated its judgment of dismissal on the ground the damages alleged resulted from the imposition or establishment of a quarantine and that liability resulting from the establishment of a quarantine was excluded from the Act.

The circuit court affirmed the lower court but on the ground that in addition to excluding liability because of a quarantine, the Act also excludes liability because of misrepresentation.

In its opinion the circuit court said:

"* * * If we take the literal meaning of the language of the complaint, it seeks to recover damage resulting from the negligent testing of the cattle for which there would be liability. But there is no claim that because of negligent testing these cattle suffered physical damages which made them less valuable, such as may come from the use of a noxious or poisonous substance.

"We must then look beyond the literal meaning of the language to ascertain the real cause of complaint. Plaintiff's real claim is that because of the negligent manner in which these tests were made, the result showed that plaintiff's cattle were diseased; whereas, in fact, they were free from disease and that the Government misrepresented the true condition of these cattle. Plaintiff's loss came about when the Government agents misrepresented the condition of the cattle, telling him they were diseased when, in fact, they were free from disease. The claim is that this misrepresentation caused plaintiff to sell his cattle at a loss. This stated a cause of action predicated on a misrepresentation. Misrepresentation as used in the exclusionary provision of the Statute was meant to include negligent misrepresentation."

The question for decision in United States v. Neustadt, supra, was whether the United States may be held liable under the federal Tort Claims Act to a purchaser of residential property who has been furnished a statement reporting the results of an inaccurate FHA inspection and appraisal and who, in reliance thereon, has been induced by the seller to pay a purchase price in excess of the property's fair value.

The Court stated the answer turned upon the correct interpretation of 28 U.S.C.A., section 2680(h), which precludes recovery upon any claim arising out of misrepresentation.

The material facts giving rise to the controversy were not in dispute.

The district court adjudged the Government liable and on appeal the judgment was affirmed. United States v. Neustadt (4 Cir.), 281 F.2d 596.

In reversing the circuit court the Supreme Court said:

"* * * The Government's position is that, since Congress employed both the terms 'misrepresentation' and 'deceit' in § 2680(h), it clearly meant to exclude claims arising out of negligent, as well as deliberate, misrepresentation; and therefore, even assuming that the District Court correctly found that the inaccurate FHA appraisal in this case resulted from a negligent inspection, and that respondents relied upon that appraisal to their detriment, the claim must nevertheless fail as one 'arising out of * * * [negligent] misrepresentation.'

"We are in accord with the view urged by the Government, and unanimously adopted by all Circuits which have previously had occasion to pass on the question, that § 2680(h) comprehends claims arising out of negligent, as well as willful, misrepresentation.

"The leading precedent has been the Second Circuit's decision in Jones v. United States, 207 F.2d 563, which involved a statement issued to the plaintiffs by the United States Geological Survey erroneously estimating the oil-producing capacity of certain land. In reliance upon that statement, plaintiffs sold securities representing oil and gas rights in the land for less than their actual value, and later sought to recoup their loss from the Government under the Tort Claims Act on a complaint alleging negligent misrepresentation. Affirming a dismissal of the complaint, the Second Circuit tersely pointed out that § 2680(h) applies to both 'misrepresenta-

tion' and 'deceit,' and, '[a]s "deceit" means fraudulent misrepresentation, "misrepresentation" must have been meant to include negligent misrepresentation, since otherwise the word "misrepresentation" would be duplicative.' 207 F.2d at page 564. Following this interpretation, in an unbroken line, * * * [citing authorities].

"Throughout this line of decisions, the argument has been made by plaintiffs, and consistently rejected by the courts, until this case, that the bar of § 2680(h) does not apply when the gist of the claim lies in *negligence* underlying the inaccurate representation, i, e., when the claim is phrased as one 'arising out of' negligence rather than 'misrepresentation.' But this argument, as was forcefully demonstrated by the Tenth Circuit in Hall v. United States, supra, is nothing more than an attempt to circumvent § 2680(h) by denying that it applies to negligent misrepresentation."

III. The issue presented by this appeal has not been previously argued to this court.

■ Although decisions and interpretations of federal courts may be illustrative and instructive to state courts in construing statutes patterned after those enacted by Congress and entitled to great weight in determining construction to be given the same phrase in subsequently enacted state statutes, they are neither conclusive nor compulsory, especially where it appears that earlier statutes substantially similar have also been enacted in other states.

■ Where the language has been borrowed from the statutes of a sister state we would go for light to the construing decisions, if any, of that state. Subsequent decisions in jurisdictions having earlier adopted similar legislation would be entitled to unusual respect and deference and will usually be followed if sound, reasonable and in harmony with justice and public policy. Ordinarily, however, the courts of a state adopting a statute are not bound by the construction placed thereon by other states which had adopted it.

For our decisions supporting the above principles in whole or in part see: Woods Bros. Const. Co. v. Iowa Unemployment Compensation Commission, 229 Iowa 1171, 1175–1178, 296 N.W. 345, 348; Stromberg Hatchery v. Iowa Emp. Sec. Comm., 239 Iowa 1047, 1050–1051, 33 N.W.2d 498, 500–501; Logan v. McMillen, 244 Iowa 1328, 1339, 60 N.W.2d 498, 504; Best v. Yerkes, 247 Iowa 800, 812, 77 N.W.2d 23, 30, 60 A.L.R.2d 1354; Lever Brothers Co. v. Erbe, 249 Iowa 454, 462, 87 N.W.2d 469, 475; In re Estate of Klug, 251 Iowa 1128, 1135, 104 N.W.2d 600, 604–605; In re Estate of Millard, 251 Iowa 1282, 1292, 105 N.W. 2d 95, 101; Blackford v. Sioux City Dressed Pork, Inc., 254 Iowa 845, 854–855, 118 N.W.2d 559, 565; and In re Estate of Tedford, 258 Iowa 890, 895, 140 N.W.2d 908, 911. See also 82 C.J.S. Statutes §§ 371–373 and 50 Am.Jur., Statutes, section 323.

■ It is the intent of our legislature that controls and the final construction and interpretation of Iowa statutory law is for this court and we should adopt the reasoning of those cases we consider the sounder. Blackford v. Sioux City Dressed Pork, Inc., supra.

IV. Speaking of the spirit and policy motivating enactment of chapter 25A we said in Graham v. Worthington, 259 Iowa 845, 860–861, 146 N.W.2d 626, 636–637:

"The general purpose of chapter 25A is to impose upon all the people of this state the burden, expense and costs which arise from tortious damage to property or injuries to persons by the officers, agents and employees of our state government. This is a valid means of promoting the general welfare of the state. This is a public purpose. [Citing authorities].

" * * *

"We can only conclude the General Assembly saw no ultimate advantage to the state by continuing to cast upon some unfortunate individuals the full burden of damage done by the tortious conduct of state officers, agents or employees.

"In fact we must assume the Sixty-first General Assembly recognized the problem here posed as one of general concern and elected to effect a solution."

V. In state government sovereign immunity remains the rule rather than the exception. A large majority of the states, and most of their political subdivisions, still are immune to any tort liability. See Report of State Legislative Research Council, August 21, 1967, page 12, The Feasibility of Abolishing or Modifying the Doctrine of Sovereign Immunity in South Dakota.

On the basis of legislation drafted in other states modifying sovereign immunity five general approaches seem to have developed. Here we are concerned only with the statutory approach used by our legislature. See Van Alstyne, The Decline of Governmental Immunity, State Government, Winter, 1966, page 32.

"A few states have followed the federal example and have enacted legislation which expressly allows for tort actions to be brought against the state and its subdivisions. Several states have established legislative and administrative methods for settling tort claims. Some jurisdictions have also found tort liability where insurance has been authorized by statute and purchased by the governmental unit; in these situations there is usually a waiver of immunity to the amount of the insurance coverage." Comment, Torts—Governmental Immunity, 50 Iowa L.Rev. (Fall, 1964), 226, 228.

Listed in footnotes to this comment as states that had then enacted legislation expressly allowing tort actions to be brought are Alaska Comp.Laws Annotated, sections 56–7–1 to –10 (Supp.1958); Hawaii Rev.

Laws, sections 245A–1 to –17 (Supp.1960); New York Court Claims Act, sections 8, 8–a (1953); Vermont Statutes Annotated, Title 12, section 5601 (Supp.1963); Washington Rev.Code, section 4.92.090 (1962).

Effective July 1, 1966, the Utah Governmental Immunity Act, chapter 139, S.L.U. 1965, provides in section 63–30–10 subsection (4) as an exclusion an injury which "arises out of a failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property, * * *"

Alaska, Hawaii and Vermont, have Tort Claims Acts with exceptions similar to those found in the federal Tort Claims Act at section 2680(h). See Alaska statutes, Code of Civil Procedure, sections 09.50.250 (3) 1958; Hawaii Rev.Laws, section 245A–15(d) 1960; Vermont Statutes Annotated, Title 12, section 5602(6) 1963. However, we have not been cited any decisions of those jurisdictions interpreting the exclusionary clause nor has our independent research revealed any.

We do not find that California, Connecticut, Illinois, Minnesota, New York, North Carolina, Washington or other states waiving a portion of their tort immunity have the exclusionary provision found at section 2680(h) of the federal Act or in the state statutes which model their acts after the federal Act. Nor do they afford any guideline to aid in interpreting section 25A.14(4) of the Iowa Act.

■ Under these circumstances we have no occasion to apply the principle mentioned in the second paragraph of Division III, supra. So to determine the intent of our legislature in enacting section 25A.14(4), we must turn to the principle that where, as here, a state legislature adopts a federal statute which had been previously interpreted by federal courts it may be presumed it knew the legislative history of the law and the interpretation placed on the provision by such federal decisions, had the same objective in mind and em-

ployed the statutory terms in the same sense. See Lever Brothers Co. v. Erbe, supra, 249 Iowa at 462, 87 N.W.2d at 475; In re Estate of Tedford, supra, 258 Iowa at 895, 140 N.W.2d at 911, and citations in these opinions; 82 C.J.S. Statutes § 371; and 50 Am.Jur., Statutes, section 323.

Hall and Neustadt, as previously noted, were decided and cited with approval by other federal jurisdictions before March 30, 1965. See Hungerford v. United States (9 Cir., 1962), 307 F.2d 99, 102; Steinmasel v. United States (D S.D. SD, 1962), 202 F.Supp. 335, 338; and Smith v. United States (D Wyo., 1963), 224 F.Supp. 402, 405. Both decisions have been cited frequently by federal jurisdictions since adoption of the Iowa Act. Jones v. United States (2 Cir., 1953), 207 F.2d 563, cert. denied 347 U.S. 921, 74 S.Ct. 518, 98 L.Ed. 1075, rehearing denied 347 U.S. 940, 74 S.Ct. 627, 98 L.Ed. 1089, another decision relied upon by the Court in United States v. Neustadt, supra, has been cited with approval several times before and since March 30, 1965.

"The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, *with certain specific exceptions,* to render the Government liable in tort as a private individual would be under like circumstances" (Emphasis supplied). Richards v. United States, 369 U.S. 1, 6, 82 S.Ct. 585, 589, 7 L.Ed.2d 492.

In Small v. United States (D Del., 1963), 219 F.Supp. 659, 661–663, the policy motivating enactment of the federal Act is expressed in consonance with that in Graham v. Worthington, supra, in this language:

"The purpose of the Federal Tort Claims Act was, at least, two-fold in character. It was, on the one hand, a recognition that a person injured in his property or person by the negligence or tort of an agent or employee of the Government was, under certain circumstances, entitled to legal ex-amination of his claim and redress for his injuries, which prior to that time were denied to him because of the Government's immunity from suit. On the other hand, it was intended to provide a forum for the determination of claims against the Government which could theretofore be only considered by a private Act of Congress. * * * By looking at the exceptions enumerated in 28 U.S.C. § 2680, we find, however, that the Government did not intend to waive immunity in all instances. * * *

" * * *

" * * * [T]he instances set out in Section 2680 are instances which Congress concluded should in no event be made applicable under the Federal Tort Claims Act."

In seeking intent of our legislature here we have no guidepost except the assumption that it intended just what Congress intended by the same language as interpreted by the federal courts.

We quote further from United States v. Neustadt, supra, 366 U.S. at 706–707, 81 S.Ct. at 1300–1301, 6 L.Ed.2d at 621:

"To say, as the Fourth Circuit did, that a claim arises out of 'negligence,' rather than 'misrepresentation,' when the loss suffered by the injured party is caused by the breach of a 'specific duty' owed by the Government to him, i. e., the duty to use due care in obtaining and communicating information upon which that party may reasonably be expected to rely in the conduct of his economic affairs, is only to state the traditional and commonly understood legal definition of the tort of 'negligent misrepresentation,' as is clearly, if not conclusively, shown by the authorities set forth in the margin, and which there is every reason to believe Congress had in mind when it placed the word 'misrepresentation' before the word 'deceit' in § 2680(h). As the Second Circuit observed in Jones v. United States, supra, 'deceit' alone would have been sufficient had Congress intended only to except deliberately

false representations. Certainly there is no warrant for assuming that Congress was unaware of established tort definitions when it enacted the Tort Claims Act in 1946, after spending 'some twenty-eight years of congressional drafting and re-drafting, amendment and counteramendment.' "

The authorities cited in the footnote are: The American Law Institute's Re-statement of Torts (1938), c. 22, "Deceit: Business Transactions", Topic 3, "Negligent Misrepresentation", section 552; Prosser, Torts (1941 ed.), c. 16, "Misrepresentation", section 87, "Basis of Responsibility" (Now Prosser, Torts, Third Ed., 1964, chapter 20, section 102); and Bohlen, Misrepresentation as Deceit, Negligence, or Warranty, 42 Harv.L.Rev. 733, 735–739 (1929); 23 Am.Jur., Fraud and Deceit, section 126, "Negligent Representations" (1939) (Now 37 Am.Jur.2d, Fraud and Deceit, sections 208 and 209).

Under the Act, the State is liable as individual only in the manner and to the extent to which it has consented. Although "the rule of liberality of construction, in favor of the exceptions, applies * * * [Citing cases] [t]he exceptions are not to be nullified through judicial interpretation, since Congress clearly delineated the areas in which it did not intend to forfeit its immunity from suit [Citing authorities] * * *." Builders Corporation of America v. United States (9 Cir., 1963), 320 F.2d 425, 426, certiorari denied 376 U.S. 906, 84 S.Ct. 660, 11 L.Ed.2d 606. The same restraint must govern us in interpreting section 25A.14(4).

We do not believe anything in Hungerford v. United States, supra, 307 F.2d at 103 or Ingham v. Eastern Airlines, Inc. (2 Cir., 1967), 373 F.2d 227, 238–239, conflicts with the conclusion we reach.

■ The legislature has not made actionable a claim against the State resulting from statements or representations which allegedly induce persons to act to their detriment. In support see Smith v. United States, supra, (D Wyo.1963), 224 F.Supp. at 405.

■ Plaintiff's petition having failed to state a cause of action upon which recovery may be had, its dismissal by the trial court is

Affirmed.

All justices concur, except LeGRAND and BECKER, JJ., who dissent.

LeGRAND, Justice (dissenting).

I dissent. I am somewhat loath to do so because the authority cited in support of the majority opinion is formidable. However, this is our first encounter with this problem, and I believe it is important to protest against that first step down what I consider to be the wrong road.

Plaintiff brought this action under the Iowa Tort Claims Act under the terms of which the State waived its governmental immunity as to certain torts caused by the negligence of any employee of the state while acting within the scope of his employment. The Act excepts certain claims from its operation. One such exception is any claim arising out of misrepresentation, which has been construed under the federal Tort Claims Act (after which ours is patterned) to include negligent misrepresentation as well as that which is fraudulent.

The majority says this is such a claim, but I cannot see it that way. This is simply a malpractice claim against a veterinarian employed by the state, who was negligent in the performance of his professional duties.

The Act does not define claims which arise out of misrepresentation. We must therefore look to general principles of established law to discover what is excluded under the exception heretofore noted. If this were not a claim under the Tort Act, no one would assert it was one based on

misrepresentation. There is abundant authority, both in our decisions and those of other jurisdictions, that plaintiff's petition here is bottomed, not on misrepresentation, but on negligence. There is nothing in the Act which changes this.

Here the conduct complained of is a faulty diagnosis of plaintiff's cattle followed by an erroneous report of their condition. The misrepresentation which the majority holds to be covered by the exception in the statute is the very report the veterinarian was required to furnish as soon as he undertook the testing of the cattle. The majority treats the duty to properly test as separable from the duty to accurately report the results of the test.

Until now that has never been the law. In Wambold v. Brock, 236 Iowa 758, 763, 764, 19 N.W.2d 582, a dentist failed to advise a patient she had a broken jaw following an extraction. This failure caused her to neglect seeking treatment which would have minimized her damages. A failure to provide information may be a misrepresentation just as much as providing improper information. Ingham v. Eastern Air Lines, Inc., 2nd Cir., 373 F.2d 227, 239. Yet there the action was based on malpractice, and *the failure to give proper advice was considered as part of the negligence.*

In Grosjean v. Spencer, 258 Iowa 685, 140 N.W.2d 139, we held a physician owed his patient the duty of disclosure, with certain exceptions not material here, *and that a doctor who failed to comply with that obligation was guilty of malpractice.*

In Wheatley v. Heideman, 251 Iowa 695, 704, 102 N.W.2d 343, and citations, after holding malpractice could consist of an improper diagnosis as well as improper treatment, we noted the doctor had told the minor patient's mother the eye was not hurt. This was grossly inaccurate and was the result of a negligent diagnosis. Again the misrepresentation did not supersede that negligence as the basis for recovery. It was merely one circumstance in the charge of malpractice against the physican.

I take it there is no doubt that a veterinarian's duty in his specialty is the same as that of a dentist, physician, or lawyer in his. Morrison v. Altig, 157 Iowa 265, 138 N.W. 510.

Statements to like effect may be found in other jurisdictions. In Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520, 525, appears this, "A physician who misleads a patient by not only failing to give a warning of reasonable and recognized risks * * * but by affirmatively assuring her that there are no risks, knowing such statement to be untrue, is liable for the harmful consequences * * *. Such a failure * * * [is] malpractice."

Similarly in Calabrese v. Bickley, 208 Misc. 407, 143 N.Y.S.2d 846, 848, the court said in a case involving a fraudulent misrepresentation by which a physician attempted to conceal his negligent acts, "The gravamen is the malpractice and the concealment merely an item in [the] chain of circumstances causing the damage."

In California the same principle was applied to a soil-tester who submitted an erroneous report based on a negligent test. It was held one who held himself out to be an expert and who failed to exercise the degree of skill and competence required of members of his profession was liable for his negligence. Incidentally it was there held plaintiff also had an action for misrepresentation. Gagne v. Bertran, 43 Cal.2d 481, 275 P.2d 15, 21.

None of these cases is cited because of any similarity factually to the one now before us, but only to demonstrate that such a claim as plaintiff asserts is not one which arises out of misrepresentation. Instead the misrepresentation has always been important only as bearing on the negligent conduct.

Any other result seems indefensible when it is pointed out that in most instances the

**914**

services hired are worthless without the ultimate communication of results from the expert to the one who employed him. Usually that is the only purpose for engaging the expert in the first place. To draw a line on one side of which he is responsible for negligence in performing his investigative or diagnostic duties while on the other he is liable only because he *told* what he did is nothing less than casuistry. See Glanzer v. Shepard, 233 N.Y. 236, 239, 135 N.E. 275, 23 A.L.R. 1425.

I can find nothing in our Tort Claims Act which justifies creation of a new and heretofore unrecognized classification of what constitutes negligent misrepresentation. I find that to be repugnant to the avowed purpose of the Act as expressed in Graham v. Worthington, 259 Iowa 845, 860, 146 N.W.2d 626, 636. If an action such as the one now before us was held to be one arising out of the negligence of the wrongdoer, *including his erroneous reports of his findings,* before the Tort Claims Act was passed, it is still such an action.

The majority relies almost entirely on two federal cases, Hall v. United States, (10 Cir.), 274 F.2d 69, and United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614. It is true they say everything the majority claims of them. However, the majority concedes we are not bound by such decisions. Where, as here, their premise is patently false and their result totally indefensible, we should not follow them simply because they were there first. Later cases such as Hungerford v. United States and Ingham v. Eastern Airlines, Inc., both cited in the majority opinion, which make distinctions more fanciful than real serve to emphasize the confusion which will inevitably result from espousal of the federal rule.

Perhaps it is unnecessary to add I would reverse.

BECKER, J., joins in this dissent.