# IN THE SUPREME COURT OF IOWA

No. 09–1010

Filed June 15, 2012

**VANIA MINOR,** Individually and as
Mother, Natural Guardian and Next
Best Friend of D.A.,

    Appellant,

vs.

**STATE OF IOWA, BECKY GRABE,**
Individually and **CLEO HESTER,**
Individually,

    Appellees.

---

Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.

Plaintiff appeals a district court order granting the defendants' motion for summary judgment. **AFFIRMED.**

Jeffrey R. Tronvold and Matthew J. Reilly of Eells & Tronvold Law Offices, P.L.C., Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General and Jeffrey S. Thompson and Anne E. Updegraff, Assistant Attorneys General, for appellee.

**WIGGINS, Justice**.

The State filed a child in need of assistance (CINA) petition. The juvenile court issued a temporary removal order, removing the child from her mother's custody and placing her in foster care. After the CINA proceeding was dismissed, the mother sued the State of Iowa and two employees of the Iowa Department of Human Services (DHS), under 42 U.S.C. § 1983 (2000) and Iowa Code chapter 669 (2005), the Iowa Tort Claims Act (ITCA), alleging the DHS social workers wrongfully removed the child from her custody and negligently failed to protect the child from abuse by a foster parent. The State and its employees sought summary judgment, which the district court granted.

On appeal, we conclude a social worker is entitled to absolute immunity when the social worker functions in the role of a prosecutor, such as when the social worker files a petition to initiate a CINA proceeding. Further, a social worker is entitled to absolute immunity when the social worker functions in the role of an ordinary witness, such as when the social worker files an affidavit after the initiation of CINA proceedings. Additionally, a social worker is entitled to qualified immunity when he or she acts in the role of a complaining witness, such as when the social worker files an affidavit in support of a CINA petition. Similarly, a social worker is entitled to qualified immunity for his or her investigatory acts. Moreover, the alleged injured parties cannot maintain an action against a social worker under the ITCA where the alleged injured parties fail to exhaust the available administrative remedy prior to filing the action in court. Finally, the alleged injured parties cannot maintain an action against a state social worker under the ITCA where the basis of the complaint is that the social worker engaged in conduct

functionally equivalent to misrepresentation or deceit. Accordingly, we affirm the decision of the district court.

## I. Background Facts and Proceedings.

A reasonable fact finder viewing the summary judgment record in the light most favorable to the plaintiffs could find the following facts. Vania Minor is the mother of D.A. Between April 2002 and January 2005, DHS conducted several child abuse assessments involving Minor and D.A.

Becky Grabe, a social worker supervisor employed by DHS, completed one such assessment on January 18, 2005, after DHS received a report alleging D.A. had been exposed to an escort service run by Minor out of their home. Grabe could not confirm the report, but found that Minor allowed troubled adolescents to stay in her home and frequently left D.A. with various caretakers. Believing Minor had placed D.A. in an environment that was unpredictable and, at times, unsafe, Grabe required Minor to sign a safety plan.

In February, Minor and D.A. were on a trip to Arizona with Minor's friend, Angel Pena, and her children. Pena testified that, at the time of the Arizona trip, her children were the subjects of an ongoing CINA proceeding and that she was not supposed to leave Iowa with them. While in Arizona, Pena received a call from an unidentified DHS employee. Pena testified the caller informed her that DHS was coming to get her children. Pena also testified the caller promised that if she cooperated she would not be in trouble and would get her kids back when she returned to Iowa.

The caller asked Pena about D.A. Pena informed the caller that D.A. needed to use the restroom while they were driving on the turnpike and that, because they were not near a restroom, D.A. put on a pull-up

diaper and wet herself.[1]  The caller then asked Pena to say that Minor forced Pena to go on the trip from Iowa to Arizona.  Because Minor had not forced Pena to go to Arizona, Pena stopped cooperating with the caller and did not tell her that Minor forced her to go on the trip.  When Pena returned to Iowa, she received another call from an unidentified DHS employee who she believes to be the same person who called her in Arizona.  During this call, the unidentified DHS employee asked Pena if Minor had a prostitution business.

Sometime following the conversations between the unidentified caller and Pena, Grabe had a discussion with her supervisor concerning a report DHS allegedly received on February 24 from an unidentified reporter.  The reporter suggested Minor was not providing D.A. with proper supervision or adequate healthcare.  In particular, the reporter indicated that Minor had not taken D.A. to the doctor even though she had been sick with a cough for two months, that D.A. was still wearing pull-ups, and that Minor did not permit D.A. to use the restroom, which contributed to D.A.'s inability to be fully toilet trained at the age of seven.

DHS did not perform a new assessment because of the cumulative nature of the report.  Instead, Grabe's supervisor instructed her to refer the case to the county attorney for possible CINA action.  The county attorney recommended that Grabe prepare an affidavit to file with the CINA petition because of a concern that Minor had fled the State with D.A.  On April 5, the county attorney filed a CINA petition and attached Grabe's affidavit.  Grabe's affidavit included all of the allegations provided by the February 24 reporter.  It also included allegations based on previous reports and DHS assessments, including allegations that

---

[1]In a deposition, Minor admitted to giving D.A. a pull-up while they were driving because they were not near any restrooms.

Minor exposed D.A. to a prostitution business, that D.A. displayed inappropriate sexualized behavior, and that Minor had left D.A. with inappropriate caregivers.

The county sheriff could not serve Minor with a summons and notice because she was no longer living at her listed address and did not leave a forwarding address. At the time, Minor and D.A. were living in Las Vegas. On May 5, the day set for the pretrial hearing, Grabe provided the juvenile court with another affidavit asking the court to place D.A. in temporary DHS custody. This affidavit indicated that Minor exposed D.A. to her prostitution business, that Minor denied D.A. contact with extended family members, that D.A. displayed sexualized behavior, that D.A. was left with unsuitable caretakers, that Minor exhibits behavior suggestive of mental illness and drug abuse, and that Grabe believed Minor intentionally took D.A. out of the state in order to flee the juvenile court and DHS systems. The court issued a temporary removal order on the basis that Minor had left the state with D.A. after the filing of the CINA petition and that Minor had allegedly exposed D.A. to prostitution. After learning about the CINA petition, Minor voluntarily returned D.A. to Iowa on May 7.

Grabe assigned D.A.'s case to Cleo Hester, another DHS social worker. Upon her removal, DHS first placed D.A. with her paternal grandmother, but the placement was discontinued because the grandmother's retirement community prohibited long-term guests. Minor proposed that DHS place D.A. with Rebecca Stutzman, a family friend. However, DHS next placed D.A. with Cathy Techau, a licensed foster parent, on May 31. That same day, the court ordered DHS "to complete a Home Study of any proposed alternate placement for the child." Hester, who was responsible for conducting any home study

pertaining to D.A.'s placement, admitted in his affidavit that he did not consider the home study a priority because Minor had informed him she was comfortable with Techau caring for D.A. Minor, who visited with D.A. at least twice after DHS placed D.A. at Techau's, admitted she did not have any concerns about the placement prior to June 6.

While in Techau's care, D.A. spent the weekdays in a daytime program at a nonprofit agency that, among other things, helps children with behavioral issues. Techau communicated concerns to the agency about D.A.'s behavior. The agency's employees indicated D.A. struggled with social interactions with other children her age. When D.A. misbehaved at the agency, she would receive discipline in the form of short time outs, during which she would be prohibited from participating in activities with the other children or be prohibited from earning certain privileges. D.A. testified she received this type of discipline for more than twenty consecutive days. According to D.A., Techau would send her to her room after dinner on each day she was disciplined at the agency. D.A. believed the door was locked. D.A. further testified she was not permitted to leave her room and sometimes wet herself. She testified that, although she did not know how to bathe properly, she took a bath every other day while at Techau's, but that Techau did not assist her.

While in Techau's care, D.A. contracted an E. coli urinary tract infection. Techau took D.A. to see a physician on June 22. The physician diagnosed D.A. with the infection and prescribed antibiotics. The physician opined an E. coli urinary tract infection is often caused by poor personal bathroom hygiene. A follow-up visit revealed the infection had cleared.

After learning about D.A.'s E. coli infection, Minor expressed dissatisfaction with the quality of foster care provided by Techau to DHS.

This prompted an unannounced visit by another DHS social worker to Techau's home on June 28. A post-visit report indicated Techau's home was clean and not a health or safety hazard. Although D.A. was not present during the visit, the report indicated the children, day care center, and foster home "appeared to be well taken care of."

Minor brought her concerns about the quality of Techau's care to the attention of the juvenile court on June 29 in an application to modify D.A.'s placement conditions. In addition to noting D.A. contracted an E. coli urinary tract infection, the application alleged that while in Techau's care D.A. was neglected, improperly supervised and disciplined, locked in her room for long periods of time, denied basic grooming and hygienic care, and not provided with proper medication. Minor urged the court to remove D.A. from Techau's home and order DHS to complete a home study of Stuzman's residence.

On June 30, the court ordered DHS to obtain a home study of the Stutzman residence. Hester completed the Stutzman home study on July 13, and DHS placed D.A. with Stutzman on July 15. On August 3, the parties agreed to the dismissal of the CINA proceeding and the juvenile court dismissed the case. D.A. returned to Minor's care.

On May 4, 2007, Minor filed claims on behalf of herself and D.A. with the state appeal board against Grabe. Minor asserted claims against Grabe for intentional infliction of emotional distress, outrageous conduct, and tortious interference with the parent–child relationship. Minor did not file a claim against Hester with the state appeal board.

On May 7, Minor, acting individually and as D.A.'s next friend, filed suit against the State of Iowa, Grabe, and Hester, asserting claims under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments of the United States Constitution, for improperly removing

D.A. from Minor's care, custody, and control, and for failing to meet the affirmative duty to protect D.A. once she was placed in foster care. On June 3, the state appeal board denied Minor's state tort claims. Minor then filed an amended and substituted petition in the district court, which, in addition to the federal law claims, asserted state tort law claims, including intentional infliction of emotional distress, outrageous conduct,[2] and tortious interference with the parent–child relationship.

Specifically, Minor alleged that Grabe was the unidentified DHS employee who called Pena, that Grabe used bribery and extortion to obtain information regarding Minor and D.A., and that Grabe filed false affidavits to remove D.A. from Minor's care, custody, and control. Minor further contended Grabe and Hester refused to comply in a timely manner with the court orders directing DHS to conduct the Stutzman home study. Finally, Minor alleged that, while in the care of Techau, D.A. was denied adequate medical care, subjected to unclean and hazardous conditions, physically and verbally abused, neglected, improperly supervised, and locked in a room.

The State, Grabe, and Hester moved for summary judgment, asserting various defenses based on immunity. The district court granted summary judgment, holding (1) Minor may not assert a claim against the State of Iowa under § 1983;[3] (2) Grabe and Hester are entitled to absolute immunity from the claims pursuant to § 1983 because they were acting in the role of prosecutors; (3) Hester is entitled to discretionary function immunity from the state tort claims pursuant to

---

[2]Minor later withdrew the claim for outrageous conduct in the district court.

[3]Minor and D.A. do not appeal the district court's determination that a plaintiff may not state a claim under § 1983 against the State of Iowa. Therefore, the appeal involving federal civil rights claims under § 1983 does not involve the State.

Iowa Code section 669.14(1); (4) Grabe is entitled to immunity from the state tort claims pursuant to Iowa Code section 669.14(4), which bars claims arising out of misrepresentation or deceit; and (5) the State of Iowa does not recognize a cause of action for tortious interference with a parent–child relationship. Minor appeals.

## II. Issues.

The issue in this appeal is whether a genuine issue of material fact exists that would justify allowing the federal civil rights claims and state tort claims to proceed to trial. Because the district court granted summary judgment based on immunity, we must determine whether and what kind of immunity state social workers are entitled to under § 1983 in the face of claims that they violated a parent's right to the care, custody, and control of her child and a child's right to adequate medical care, protection, and supervision. We must also determine whether these state social workers are entitled to immunity from state tort claims brought pursuant to the ITCA.

## III. Scope of Review.

We review an order granting summary judgment for correction of errors at law. *Robinson v. Fremont Cnty.*, 744 N.W.2d 323, 325 (Iowa 2008). The district court correctly enters a summary judgment when the moving party demonstrates that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). To determine whether the moving party met his or her burden, we examine the record in the light most favorable to the party opposing the motion for summary judgment. *Rants v. Vilsack*, 684 N.W.2d 193, 199 (Iowa 2004). We review "the record before the district court and determine whether there was a material fact in dispute and if

not, whether the district court correctly applied the law." *Robinson*, 744 N.W.2d at 325.

## IV. Federal Civil Rights Claims.

42 U.S.C. § 1983 enables those individuals whose constitutional rights were deprived by persons acting under color of state law to seek redress for their grievances. *Dickerson v. Mertz*, 547 N.W.2d 208, 214 (Iowa 1996). To prevail on a claim under § 1983, a plaintiff must establish

> (1) that the defendant deprived the plaintiff of a right secured by the [C]onstitution and laws of the United States, (2) that the defendant acted under color of state law, (3) that the conduct was a proximate cause of the plaintiff's damage, and (4) the amount of damages.

*Leydens v. City of Des Moines*, 484 N.W.2d 594, 596 (Iowa 1992). While § 1983 does not recognize the defense of immunity on its face, the United States Supreme Court has held government employees have absolute immunity from suit in some circumstances and qualified immunity from suit in others. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268–69, 113 S. Ct. 2606, 2613, 125 L. Ed. 2d 209, 223 (1993) (stating that while qualified immunity is usually sufficient to protect government officials, some officials deserve absolute protection).

The district court concluded there was a genuine issue of material fact as to whether Minor's substantive due process rights and D.A.'s Fourth Amendment right to be free from unreasonable seizure were violated. However, the district court nonetheless granted the motion for summary judgment, finding absolute immunity barred the claims because Grabe's actions in helping to initiate the CINA action and Hester's actions in making a recommendation for the placement of D.A. were the functional equivalent of actions performed by a prosecutor.

**A.  Absolute Immunity.**  Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  Despite its broad language, the Supreme Court has consistently held § 1983 did not abolish long-standing common law immunities enjoyed by government officials in civil suits when Congress enacted it in 1871.  *See Buckley*, 509 U.S. at 268, 113 S. Ct. at 2612–13, 125 L. Ed. 2d at 222–23; *Burns v. Reed*, 500 U.S. 478, 484, 111 S. Ct. 1934, 1938, 114 L. Ed. 2d 547, 557 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 417–18, 96 S. Ct. 984, 989, 47 L. Ed. 2d 128, 136 (1976).  When faced with a question of whether a government official has absolute immunity from civil liability resulting from his or her acts, we employ a "functional approach" to determine whether those actions "fit within a common-law tradition of absolute immunity."  *Buckley*, 509 U.S. at 269, 113 S. Ct. at 2613, 125 L. Ed. 2d at 223; *see also Beck v. Phillips*, 685 N.W.2d 637, 642 (Iowa 2004).

Under this "functional approach," we do not look to the identity of the government actor, but instead to "the nature of the function performed."  *Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 545, 98 L. Ed. 2d 555, 566 (1988).  We only grant absolute immunity for those

> governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed " 'with independence and without fear of consequences.' "

*Rehberg v. Paulk*, 566 U.S. ___, ___, 132 S. Ct. 1497, 1503, 182 L. Ed. 2d 593, 601 (2012) (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S. Ct. 1213, 1218, 18 L. Ed. 2d 288, 294 (1967)).  A government official may be entitled to absolute immunity where the official performs a function analogous to that of a government official who was immune at common law.  *See Butz v. Economou*, 438 U.S. 478, 513–15, 98 S. Ct. 2894, 2914–15, 57 L. Ed. 2d 895, 920–21 (1978) (holding an administrative agency's officials who perform functions analogous to those of a prosecutor or judge are entitled to absolute immunity).

After determining the nature of the function, we evaluate "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."  *Forrester*, 484 U.S. at 224, 108 S. Ct. at 542, 98 L. Ed. 2d at 563.  In particular, we must examine whether absolute immunity for the particular official performing this particular function will "free the *judicial process* from the harassment and intimidation associated with litigation."  *Burns*, 500 U.S. at 494, 111 S. Ct. at 1943, 114 L. Ed. 2d at 563; *see also Butz,* 438 U.S. at 512, 98 S. Ct. at 2913, 57 L. Ed. 2d at 919 ("Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.").  The official seeking absolute immunity bears the burden of justifying such immunity.  *Beck*, 685 N.W.2d at 643; *see also Burns*, 500 U.S. at 486, 111 S. Ct. at 1939, 114 L. Ed. 2d at 558.  "The presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties."  *Burns*, 500 U.S. at 486–87, 111 S. Ct. at 1939, 114 L. Ed. 2d at 558.  Therefore, we must "be sparing in our recognition of absolute immunity."  *Beck*, 685 N.W.2d at 643.

For example, prosecutors are entitled to absolute immunity from civil liability when they perform functions "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430, 96 S. Ct. at 995, 47 L. Ed. 2d at 143. As such, a prosecutor has absolute immunity "in initiating a prosecution and in presenting the State's case." *Id.* at 431, 96 S. Ct. at 995, 47 L. Ed. 2d at 144. Acts falling within this function include the preparing and filing of trial information and motions. *Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S. Ct. 502, 509, 139 L. Ed. 2d 471, 480–81 (1997); *see also Burr v. City of Cedar Rapids*, 286 N.W.2d 393, 396 (Iowa 1979) (holding a prosecutor has absolute immunity for signing and filing a complaint or information containing false statements); *Blanton v. Barrick*, 258 N.W.2d 306, 310–11 (Iowa 1977) (holding a prosecutor has absolute immunity for initiating a prosecution). Such acts also include decisions not to prosecute, *Beck*, 685 N.W.2d at 644, decisions to defer prosecution, recommendations that criminal defendants pay court costs when prosecutions are dismissed or deferred, and for the training, supervision, and control of another prosecutor, *Hike v. Hall*, 427 N.W.2d 158, 160–62 (Iowa 1988).

Prosecutors, however, do not have absolute immunity when they perform investigatory acts before probable cause to arrest arises because police traditionally perform this function. *Buckley*, 509 U.S. at 274–76, 113 S. Ct. at 2616–17, 125 L. Ed. 2d at 226–28; *McGhee v. Pottawattamie Cnty.*, 547 F.3d 922, 933 (8th Cir. 2008) ("[I]mmunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not a 'distinctly prosecutorial function.' "). For example, prosecutors do not have absolute immunity when they give advice to the police to aid them

in obtaining a confession. *Burns*, 500 U.S. at 496, 111 S. Ct. at 1944–45, 114 L. Ed. 2d at 564–65. Moreover, prosecutors do not have absolute immunity when they perform administrative acts. *See Buckley*, 509 U.S. at 277–78, 113 S. Ct. at 2617–18, 125 L. Ed. 2d at 228–29 (holding a prosecutor's act of holding a press conference was an administrative act not entitled to absolute immunity because it did "not involve the initiation of a prosecution, the presentation of the state's case in court, or actions preparatory for these functions"); *Beck*, 685 N.W.2d at 645 (concluding a prosecutor's act of writing letters to the police department and mayor is not "intimately associated with the judicial phase of the criminal process" (internal citation and quotation marks omitted)).

Finally, absolute immunity does not shield a prosecutor who prepares and files a sworn affidavit to accompany a motion for an arrest warrant. *Kalina*, 522 U.S. at 130–31, 118 S. Ct. at 510, 139 L. Ed. 2d at 482. This is because, in doing so, the prosecutor is "perform[ing] the function of a complaining witness,"[4] not that of an advocate. *Kalina*, 522 U.S. at 131, 118 S. Ct. at 510, 139 L. Ed. 2d at 482; *see also Malley v. Briggs*, 475 U.S. 335, 343–45, 106 S. Ct. 1092, 1097–98, 89 L. Ed. 2d 271, 280–81 (1986) (holding absolute immunity does not protect a police officer who files an affidavit in support of an arrest warrant and receives

---

[4]When Congress enacted § 1983 as part of the Civil Rights Act of 1871, private parties frequently prosecuted criminal cases. *Rehberg v. Paulk*, 566 U.S. ___, ___, 132 S. Ct. 1497, 1503, 182 L. Ed. 2d 593, 602 (2012). Although these private individuals did not necessarily give testimony at trial, they were called "complaining witnesses." *Id.* at ___, 132 S. Ct. at 1507, 182 L. Ed. 2d at 606. "Complaining witnesses" were not absolutely immune from civil liability at common law. *Malley v. Briggs*, 475 U.S. 335, 340, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271, 278 (1986). Public officials increasingly assumed the prosecutorial function after Congress passed the Civil Rights Act of 1871. *Rehberg*, 566 U.S. at ___, 132 S. Ct. at 1504, 182 L. Ed. 2d at 603. Unlike private prosecutors, public prosecutors were absolutely immune from tort claims at common law to protect them from harassing litigation. *Id.*

the arrest warrant even though he lacks probable cause to arrest). Complaining witnesses are distinguishable from witnesses at trial, ordinary witnesses, who are absolutely immune from any claim arising from their testimony. *Rehberg*, 566 U.S. at ___, 132 S. Ct. at 1505, 182 L. Ed. 2d at 604; *see also Briscoe v. LaHue*, 460 U.S. 325, 335–36, 103 S. Ct. 1108, 1115–16, 75 L. Ed. 2d 96, 108 (1983) (holding a police officer is entitled to absolute immunity when he gives perjured testimony during a criminal trial).

The Supreme Court has never considered whether social workers are entitled to absolute immunity, but many other jurisdictions have. Some federal circuit courts grant social workers absolute immunity on the basis that their functions are "quasi-judicial," like those of prosecutors. *See Ernst v. Child & Youth Servs.*, 108 F.3d 486, 495 (3d Cir. 1997); *Thomason v. SCAN Volunteer Servs., Inc.*, 85 F.3d 1365, 1373 (8th Cir. 1996); *Millspaugh v. Cnty. Dep't of Pub. Welfare*, 937 F.2d 1172, 1176 (7th Cir. 1991); *Vosburg v. Dep't of Soc. Servs.*, 884 F.2d 133, 135 (4th Cir. 1989); *Salyer v. Patrick*, 874 F.2d 374, 378 (6th Cir. 1989); *Meyers v. Contra Costa Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987). These courts hold a social worker performs a function analogous to that of a prosecutor when the social worker prepares for, initiates, or prosecutes child dependency proceedings. *See, e.g., Ernst*, 108 F.3d at 495; *see also Meyers*, 812 F.2d at 1157 (denying a social worker's claim of absolute immunity where, prior to the initiation of dependency proceedings, the social worker ordered a father to stay away from his home until after a hearing before the juvenile court). These courts reason social workers must exercise independent judgment in determining when to bring such proceedings and note dependency proceedings incorporate measures to safeguard citizens from the

unconstitutional acts of social workers. *See Ernst,* 108 F.3d at 495. As the Ninth Circuit explained,

> Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.

*Meyers,* 812 F.2d at 1157. Conversely, courts have denied social workers absolute immunity in cases in which they characterized the social workers' conduct in removing children from their home without a court order, *see Hodorowski v. Ray,* 844 F.2d 1210, 1216 (5th Cir. 1988); *Robison v. Via,* 821 F.2d 913, 919–20 (2d Cir. 1987), or in ordering a father to stay away from his home until after a hearing before the juvenile court, *Meyers,* 812 F.2d at 1157, as investigatory or other conduct taking place prior to the initiation of dependency proceedings.

Courts have arrived at varying results in suits involving allegations social workers included false statements or intentional misrepresentations in sworn affidavits submitted to the court. Some courts have declined to grant social workers absolute immunity in these cases on the basis the social workers were performing functions analogous to complaining witnesses. *See Beltran v. Santa Clara Cnty.,* 514 F.3d 906, 908 (9th Cir. 2008) (holding social workers are not entitled to absolute immunity from claims that they made false statements in a sworn affidavit accompanying a child dependency petition); *Austin v. Borel,* 830 F.2d 1356, 1363 (5th Cir. 1987) (holding social workers are

not entitled to absolute immunity in the face of claims they filed a sworn statement containing allegedly false statements). Other courts, however, have granted social workers absolute immunity in these situations. *See Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 725–26 (6th Cir. 2011) (holding a caseworker who allegedly made intentional misrepresentations in affidavits was entitled to absolute immunity); *Thomason*, 85 F.3d at 1373 ("To the extent [the caseworker is] sued because [the caseworker] made arguably false statements in her affidavit in her role as a witness before the state court, the doctrine of absolute witness immunity applies.").

These latter cases reason that advocacy is the key to prosecutorial immunity and that social workers are entitled to absolute immunity when they act as an advocate before the court, which includes the act of filing an affidavit reflecting the social worker's opinions and recommendations as to what is in the best interests of the child. *See Pittman*, 640 F.3d at 725, *Thomason*, 85 F.3d at 1373; *see also Holloway v. Brush*, 220 F.3d 767, 776 (6th Cir. 2000) ("[A]bsolute immunity extends to social workers only when they are acting in the capacity of *legal advocates.* It is apparent that Ohio law does not envision a caseworker's principal function as that of an advocate, although at a certain stage in custody proceedings a caseworker might be called by the prosecutor to present reports or make recommendations that, functionally, constitute advocacy.").

We believe an appropriate application of the functional analysis prohibits us from making a broad decision about the type of immunity available to social workers when they file an affidavit allegedly containing false statements or misrepresentations. Accordingly, if the social worker is acting as a complaining witness, then the social worker is not entitled

to absolute immunity because complaining witnesses were not absolutely immune at common law. *See Rehberg*, 566 U.S. at ___, ___, 132 S. Ct. at 1504, 1507, 182 L. Ed. 2d at 606. However, if the social worker is functioning as an ordinary witness, then the social worker is entitled to absolute immunity. *See Briscoe*, 460 U.S. at 332–34, 103 S. Ct. at 1114–15, 75 L. Ed. 2d at 106–07.

1. *Whether Grabe is entitled to absolute immunity.* Although the district court found that Grabe's actions generally constituted the initiation of CINA proceedings, we must narrow the scope in which we view her actions. The claim against Grabe is predicated on allegations that she manufactured, coerced, and fabricated evidence and then used such evidence to remove D.A. from Minor's care, custody, and control. Minor and D.A. claim Grabe bribed and extorted Pena and attempted to suborn perjury in order to cause the county attorney to file a CINA petition. They also claim Grabe used this information in two affidavits, which resulted in D.A.'s removal. Therefore, we need to evaluate whether Grabe is immune from liability potentially stemming from three separate acts—procuring evidence by coercing Pena to provide information and false testimony, causing the county attorney to file a CINA petition, and filing two sworn affidavits.

Minor and D.A. first complain Grabe's procurement of evidence violated her constitutional rights. Assuming Minor and D.A.'s account of the facts is correct, Grabe was the DHS employee who called Pena seeking information about Minor and D.A. Grabe then included information acquired during this call in the affidavit she provided with the CINA petition. The procurement of evidence, no matter how accomplished, constitutes an investigatory act. *See Buckley*, 509 U.S. at 274–76, 113 S. Ct. at 2616–17, 125 L. Ed. 2d at 226–28. Although

Grabe's investigation ultimately led to the initiation of a CINA action, we conclude Grabe is not entitled to absolute immunity for her investigatory acts. Because the Supreme Court has refused to apply such an expansive interpretation of absolute immunity to prosecutors serving an investigatory function, we believe absolute immunity cannot shield a social worker from liability for his or her investigatory acts.

Second, Minor and D.A. allege Grabe violated her rights by causing the county attorney to file a CINA petition. Once DHS determines the best interests of the child or safety concerns necessitate juvenile court action, DHS must "act appropriately to initiate [a CINA] action." Iowa Code § 232.71C(1). By statute, only DHS, a juvenile court officer, or a county attorney may file a CINA petition. *Id.* § 232.87(2). Regardless, however, of whether the county attorney or a DHS social worker files the petition, the county attorney represents DHS in CINA proceedings. *Id.* § 232.90(1).

Minor and D.A. argued in their resistance to the motion for summary judgment that DHS social workers perform a function more akin to police than to prosecutors. Following the reasoning of the federal circuits granting absolute immunity to social workers, Grabe would be entitled to absolute immunity if she had filed the petition on her own. It would be perverse to deny Grabe absolute immunity for the act of filing the petition on the basis she sought the advice of the county attorney, who in fact filed the petition. The presence of the county attorney provides an additional layer of protection to the public against a social worker abusing his or her authority.

Further, we have stated a county attorney has a duty to advocate for the position of DHS and may not " 'assert his [independent] vision of the state interest.' " *In re A.W.,* 741 N.W.2d 793, 803 (Iowa 2007)

(citation omitted); *see also* Iowa Code § 232.90(2). In that case, we considered whether a county attorney could appeal a juvenile court's ruling on his own while, at the same time, the Iowa Attorney General moved to dismiss the appeal. *In re A.W.,* 741 N.W.2d at 800. We did not consider that case in the context of whether a county attorney must follow DHS's recommendation of filing a CINA petition. However, because we strive to afford the greatest possible protection to victims and potential victims of child abuse, *see* Iowa Code § 232.67, when a social worker presents an assessment indicating child abuse to a county attorney and the social worker recommends the initiation of CINA proceedings, we believe the social worker is performing a function akin to that of a prosecutor. The CINA hearing will provide additional protection to the people of Iowa from social workers who abuse their authority.

Therefore, when a DHS social worker refers a case to the county attorney for possible CINA action and the county attorney files the CINA petition, the social worker is performing a function analogous to that of a prosecutor and should be afforded comparable immunity. Consequently, Grabe has absolute immunity from liability stemming from the act of referring the case to the county attorney for possible CINA action and the county attorney's act of filing of the CINA petition.

Finally, Minor and D.A. complain Grabe violated their rights by filing two affidavits—one filed with the CINA petition requesting the juvenile court adjudicate D.A. pursuant to the CINA section of the Iowa Code and one presented at a hearing regarding the CINA proceeding recommending the court place D.A. in temporary DHS custody. By statute, a CINA petition must be supported by an affidavit setting forth the information and beliefs upon which the petition is based. Iowa Code § 232.36(2). We believe a social worker who files an affidavit along with a

CINA petition acts as a complaining witness. Just as prosecutors, *Kalina*, 522 U.S. at 130–31, 118 S. Ct. at 510, 139 L. Ed. 2d at 482, and police officers, *Malley*, 475 U.S. at 343–45, 106 S. Ct. at 1097–98, 89 L. Ed. 2d at 280–81, are not afforded absolute immunity for the act of preparing and filing a sworn affidavit to accompany a motion or application for an arrest warrant, social workers should not be afforded absolute immunity for this act either. Therefore, Grabe does not have absolute immunity for the filing of the affidavit attached to the petition.

The filing of an affidavit after the CINA proceeding starts is more complicated. The purpose of the affidavit is not to initiate a proceeding, but rather, to testify before the court with testimony during the course of the proceeding to provide a basis to temporarily remove the child from the present custodian. *See* Iowa Code § 232.78(7)(*a*). In other words, the social worker is nothing more than an ordinary witness at this point in the proceeding, providing his or her testimony by affidavit, rather than in person. As a social worker's testimony and recommendations may be vitally important, the social worker should be able to present his or her testimony and recommendations in court without fear of liability arising from such testimony and recommendations. *See Briscoe*, 460 U.S. at 335–36, 103 S. Ct. at 1115–16, 75 L. Ed. 2d at 108. Therefore, Grabe has absolute immunity for the filing of the affidavit regarding temporary custody.

2. *Whether Hester is entitled to absolute immunity.* The § 1983 claim against Hester is that he failed to ensure D.A. was provided adequate medical care, protection, and supervision while in the care of Techau through his refusal, despite a court order, to timely conduct the Stutzman home study. This alleged conduct is not protected by absolute immunity because it is not an integral part of the judicial process.

The district court held Hester's role in the court action was to "make a recommendation for placement of D.A." The court then held that, based on *Thomason*, Hester was entitled to absolute immunity because witness immunity applies to providing reports and recommendations to the court. *See Thomason*, 85 F.3d at 1373. Hester ultimately filed an investigative report—the Stutzman home study—as ordered. However, the claims of Minor and D.A. are not based on the content of that report. The claims against Hester are instead based on the allegation that he failed to timely conduct his investigation and make his report, in violation of a court order, and failed to provide adequate medication, protection, and supervision to D.A. Hester is not entitled to absolute immunity for liability stemming from investigatory conduct, such as this.

Further, the district court's reasoning is directly at odds with federal case law denying social workers qualified immunity where they fail to meet their obligation to provide adequate medical care, protection, and supervision to children placed in the custody of the state. *See, e.g.*, *Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993). Accordingly, we conclude absolute immunity does not shield Hester for his actions in this case.

**B. Qualified Immunity.** Because the district court held Grabe and Hester are entitled to absolute immunity, the court did not determine whether Grabe is entitled to qualified immunity for her investigative acts or for the act of filing as a complaining witness. The court also did not address whether Hester is entitled to qualified immunity for his actions in allegedly failing to timely conduct the Stutzman home study and in failing to investigate D.A.'s placement. We have stated that we will, "in the interest of sound judicial

administration," decide an issue the parties raised below and fully briefed and argued in this court even if the district court did not reach the issue because it was "deemed unnecessary to the decision under the rationale it elected to invoke." *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 378 (Iowa 1986) (internal citation and quotation marks omitted). Here, the parties raised the issue of qualified immunity before the district court. They also raised and argued it in their briefs before this court, and we choose to address it.

Even if absolute immunity does not shield an official from liability, "the doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565, 573 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982)); *see also Leydens*, 484 N.W.2d at 597. Qualified immunity balances two important competing interests—"the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231, 129 S. Ct. at 815, 172 L. Ed. 2d at 573.

In addressing the defendants' claim of qualified immunity, we consider, in any order, whether the facts alleged by the plaintiff "make out a violation of a constitutional right" and whether that right was " 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 236, 129 S. Ct. at 815–16, 818, 172 L. Ed. 2d at 573, 576. A constitutional right is clearly established when "[t]he

contours of the right [are] sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523, 531 (1987). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.' " *Reichle v. Howards*, 566 U.S. ___, ___, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985, 992 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149, 1159 (2011)). Therefore, if the law at the time of the alleged conduct did not clearly establish that the government official's conduct would violate the Constitution, the government official is entitled to qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583, 589 (2004).

1. *Whether Grabe violated clearly established constitutional rights of Minor or D.A.* Minor and D.A. assert Grabe violated her clearly established constitutional rights by bribing and extorting Pena, attempting to suborn perjury, and filing an affidavit containing perjured testimony. Although the district court found a genuine issue of material fact as to whether Grabe's actions violated Minor's interest in the care, custody, and control of D.A.[5] and D.A.'s Fourth Amendment right to be free from unreasonable search and seizure, we need not decide whether Grabe's conduct violated these constitutional rights.

Minor and D.A. argue it was clearly established in 2005 that a DHS employee could not bribe or extort a witness or suborn perjury. In

---

[5]The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects this right. *See Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49, 56–57 (2000); s*ee also In re K.M.*, 653 N.W.2d 602 (Iowa 2002) ("Normally, there is no justification for the State's interference in the private relations of a family . . . because a parent's . . . right to the companionship, care, custody, and management of his or her children is an important interest . . . .").

support of this proposition, they point to sections of the Iowa Code criminalizing extortion, bribery of a witness, and suborning perjury. Even assuming Grabe engaged in this illegal conduct, Minor and D.A. have not pointed to any judicial opinion existing at the time of the alleged conduct holding a social worker violates the constitutional rights of a parent or child by engaging in such conduct. While Minor and D.A. need not point to a case holding this conduct violates constitutional rights per se, they must nonetheless point to authority sufficiently analogous to make the violation of the constitutional right apparent. *See Anderson,* 483 U.S. at 640, 107 S. Ct. at 3039, 97 L. Ed. 2d at 531; *see also Costanich v. Dep't of Soc. & Health Servs.,* 627 F.3d 1101, 1115 (9th Cir. 2010) (holding the deliberate falsification of evidence in a child abuse investigation and the inclusion of false evidentiary statements in an affidavit violates constitutional rights where a deprivation of liberty or property interests occurs, but that this rule only applies in future cases in the circuit and not to the case at bar).

Minor and D.A. also allege Grabe committed perjury by submitting an affidavit as a complaining witness containing falsified evidence. Again, Minor and D.A. have failed to identify authority existing at the time of the alleged conduct that demonstrated a social worker violates the constitutional rights of a parent or child by filing an affidavit containing false statements. Even if Minor had identified such an authority, *see, e.g., Costanich,* 627 F.3d at 1115, the facts viewed in the light most favorable to them do not demonstrate Grabe was successful in fabricating evidence or coercing false evidence. At most, the facts viewed in the light most favorable to Minor and D.A. support an allegation that Grabe *attempted* unsuccessfully to coerce false evidence from Pena. Even if Grabe suborned perjury, the record does not support a finding

that Pena supplied false evidence to Grabe or that false evidence appeared in Grabe's affidavit. All of the evidence in Grabe's affidavit can be traced to truthful information provided by Pena or information obtained during previous investigations conducted in good faith. Minor and D.A. do not assert the previous DHS investigations were not conducted in good faith. Had the affidavit contained information obtained through the subornation of perjury, then a genuine issue of material fact may have existed to defeat summary judgment.

Therefore, Minor and D.A. have not presented a genuine issue of material fact regarding whether Grabe violated their clearly established constitutional rights through her investigatory acts or by submitting an affidavit as a complaining witness to the court. Accordingly, Grabe is entitled to qualified immunity as a matter of law for these alleged actions.

2. *Whether Hester violated the clearly established constitutional rights of Minor or D.A.* Minor and D.A. argue Hester deliberately failed to conduct the Stutzman home study and failed to investigate D.A.'s placement after Minor raised concerns about the conditions in Techau's home, which violated D.A.'s right to adequate medical care, protection, and supervision. Hester acknowledges children who have been removed from the care of their parents and placed in foster care have a clearly established constitutional right to adequate medical care, protection, and supervision. *See Burton v. Richmond*, 276 F.3d 973, 979–80 (8th Cir. 2002) (finding social workers are not entitled to qualified immunity under § 1983 for a claim based on a failure to provide for basic human needs and reasonable safety of children in foster care by failing to supervise their foster care placement, to conduct a criminal history check on the foster parent, and to investigate or remove the children after numerous complaints of sexual abuse and discovery of a foster parent's criminal

history of sexual abuse); *Norfleet*, 989 F.2d at 293 (finding social workers were not entitled to qualified immunity where a child with severe asthma died after he was placed with foster parent who ignored his medical needs). Hester argues, however, that he is entitled to qualified immunity because Minor and D.A. failed to raise a genuine issue of material fact as to whether he violated D.A.'s clearly established constitutional right under the particular facts presented in the summary judgment record.

Although federal circuit courts have recognized the right of a foster child to adequate care, they have expressed some disagreement regarding the proper standard for determining whether a social worker violated those rights. Some apply a standard adopted by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982), which addressed the rights of an involuntarily institutionalized and mentally handicapped plaintiff who was injured while in state care. Under *Youngberg*, a state actor is liable for his conduct if it amounts to "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42. The Tenth Circuit expressly adopted the *Youngberg* standard, explaining that

> [t]o the extent there is a difference in the standards, we agree with the Seventh Circuit that the *Youngberg* standard applies. The compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are "entitled to more considerate treatment and conditions" than criminals. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves.

*Yvonne L. v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 894 (10th Cir. 1992) (quoting *Youngberg*, 457 U.S. at 321–22, 102 S. Ct. at 2461, 73 L.

Ed. 2d at 41); *see also K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 854 (7th Cir. 1990) (explaining social workers expose themselves to liability if they place a child "in hands they know to be dangerous or otherwise unfit" without a justification based on financial constraints or "considerations of professional judgment").

Other circuits apply a deliberate indifference standard, first articulated by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976), and originally applied to challenges by prisoners under the Eighth Amendment. *See Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 796–97 (11th Cir. 1987); *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 145 (2d Cir. 1981). Under this standard, social workers may be liable under § 1983 if they "exhibited deliberate indifference to a known injury, a known risk, or a specific duty and their failure to perform the duty or act to ameliorate the risk of injury was a proximate cause of plaintiff's deprivation of rights." *Doe*, 649 F.2d at 145; *see also Burton*, 276 F.3d at 980 (finding the record could demonstrate that social workers were not entitled to qualified immunity because they exhibited a "grossly deliberate indifference" where they ignored numerous allegations of sexual abuse).

However, we need not decide whether to adopt the *Youngberg* or deliberate indifference standard. Irrespective of which standard we adopt, we hold Minor and D.A. failed to raise a genuine issue of material fact as to whether Hester violated their clearly established constitutional rights.

In this case, the duration of D.A.'s placement with Techau was from May 31 until July 15, a relatively short time. To determine whether Hester substantially departed from accepted professional judgment, practice, or standards or exhibited deliberate indifference to known risks,

we must examine the nature of the concerns Minor expressed to DHS, when Minor informed DHS of her concerns, and DHS's response. Minor fails to provide any affidavit or testimony stating the exact complaints she made to DHS or the date on which she made them. Some of the concerns about Techau's care for D.A. appear to relate to improper discipline of D.A. Techau would report to the agency where D.A. spent her days that D.A. had misbehaved in the foster home and had to stay in her room. The agency would then discipline D.A. by preventing her from participating in activities. Then, when the agency reported to Techau that D.A. had been disciplined, Techau would allegedly lock D.A. in her bedroom after dinner, thereby perpetuating the cycle. Examining the record in the light most favorable to Minor, the record does not indicate whether Minor informed DHS of her concerns about D.A.'s discipline.

The concerns about D.A.'s care also relate to an E. coli urinary tract infection. Minor alleges the infection developed because Techau denied D.A. appropriate access to bathroom facilities. D.A. testified by deposition that she sometimes wet the bed when she was allegedly locked in her room. D.A.'s occasional bed-wetting prompted Techau to get pull-up diapers for D.A. D.A. also testified that she bathed every other day, but that Techau did not help her and she did not know how to clean herself properly. It is uncontested that Techau took D.A. to a doctor shortly after symptoms of the infection manifested, that the infection is common in young girls, and that the infection cleared up in the expected time after D.A. took medication.

Although it is undisputed Minor raised concerns about the quality of Techau's foster care, the exact date she raised those concerns is unknown. Minor admitted in her deposition that she did not have concerns about the placement prior to June 6 at the earliest. Further,

Minor indicated she did not become concerned about D.A.'s health until she learned that D.A. had an E. coli infection. Although Minor knew D.A. was going to see a doctor, she could not have known about the doctor's diagnosis until June 22, the date Techau took D.A. to see the doctor. Hester's affidavit confirms Minor did not raise her concerns until at least this date because it states that Minor initially informed him she was comfortable with Techau caring for D.A. and that Minor did not raise concerns about the quality of Techau's care until late June.

Once Minor expressed concerns to DHS about the foster care, a DHS social worker made an unannounced visit to investigate the Techau home on June 28. At most, the unannounced visit took place on the fourth business day following D.A.'s visit to the doctor. A subsequent report indicated no problems with Techau's home or the care she was providing.

Moreover, Techau is a state-licensed foster parent. Licensed foster parents are subject to at least one unannounced inspection each year. *See* Iowa Code § 237.7. There is nothing in the record indicating Techau's foster home had any previous problems, complaints, health risks, or safety risks prior to the time Minor raised her concerns.

Therefore, Hester did not ignore the concerns Minor raised about the quality of Techau's foster care because DHS conducted an unannounced assessment of the Techau home after Minor raised her concerns. Additionally, as we have already noted, Techau took D.A. to the doctor when the symptoms of an infection arose and the doctor testified the infection resolved within the expected time after a doctor prescribed medication.

Finally, although the court ordered DHS "to complete a Home Study of any proposed alternate placement for the child" on May 31,

Minor originally informed Hester that she was comfortable with Techau caring for Minor and did not raise any concerns to DHS or the court about Techau's care until the end of June. The court ordered Hester to complete the Stutzman home study on June 30. Hester completed the study on July 13. There is no factual basis in this record supporting a finding that thirteen days was an unreasonable length of time to complete the home study given that the recently completed DHS report of the conditions within the Techau home produced no evidence of a poor environment.

Accordingly, there is no genuine issue of material fact that Hester deliberately allowed D.A. to continue a foster care placement that he knew "to be dangerous or otherwise unfit" because the unannounced visit did not reveal any health or safety concerns with Techau's home. *See K.H.*, 914 F.2d at 854. Similarly, there is no genuine issue of material fact that Hester demonstrated "a grossly deliberate indifference" to D.A.'s welfare. *See Burton*, 276 F.3d at 980. Hester responded to concerns about the foster care placement based on his professional judgment informed by the recent unremarkable results of the worker's visit to the Techau home and thereafter followed through on the Stutzman home study within a reasonable amount of time after the court ordered him to do so. Consequently, we find no genuine issue of material fact on the issue of whether Hester violated the clearly established constitutional rights of Minor or D.A. and Hester is entitled to qualified immunity as a matter of law.

**C. State Tort Claims.** Minor's amended and substituted petition alleges two state law claims against Grabe, Hester, and the State of Iowa. Specifically, Minor claims intentional infliction of emotional distress and tortious interference with the parent–child relationship. Minor brought

these claims pursuant to the ITCA, codified in Iowa Code chapter 669.[6] As a preliminary note, there is some debate as to whether Iowa recognizes a cause of action for tortious interference with the parent–child relationship. We express no opinion as to whether Iowa recognizes this cause of action and any references to a claim for tortious interference with the parent–child relationship are solely for the purpose of discussing the district court's grant of summary judgment.

The ITCA waives sovereign immunity for tort claims against the State with certain exceptions. *Feltes v. State*, 385 N.W.2d 544, 545 (Iowa 1986); *see also* Iowa Code § 669.4. While the ITCA does not create a cause of action, it "recognizes and provides a remedy for a cause of action already existing which would have otherwise been without remedy because of common law immunity." *Engstrom v. State*, 461 N.W.2d 309, 314 (Iowa 1990).

1. *Claims against Hester under the ITCA.* Although the district court granted summary judgment in favor of Hester, finding that Hester was entitled to immunity pursuant to Iowa Code section 669.14(1), the discretionary function exception, we affirm because the court lacks subject matter jurisdiction to hear any claims against Hester under the ITCA.

Hester argues the district court lacked subject matter jurisdiction to hear the state tort claims brought against him because Minor did not file a claim against him with the state appeal board as required by statute.[7] Iowa Code section 669.5 precludes the filing of a suit under the

---

[6]Prior to 1993, Iowa Code chapter 25A contained the ITCA.

[7]Even if Hester had failed to raise this argument, we may examine the grounds for subject matter jurisdiction on our own motion regardless of whether a party raised the issue. *See In re Jorgensen*, 627 N.W.2d 550, 554–55 (Iowa 2001).

ITCA "unless the state appeal board has made final disposition of the claim." Iowa Code § 669.5.[8] Section 669.13 provides, "[e]very claim and suit permitted under this chapter shall be forever barred, unless within two years after such claim accrued, the claim is made in writing to the state appeal board under this chapter." *Id.* § 669.13.[9]

We have interpreted these provisions to mean that the state appeal board has exclusive jurisdiction over all tort claims against the state. *Swanger v. State*, 445 N.W.2d 344, 347 (Iowa 1989). Therefore, a plaintiff must present his or her claim under the ITCA to the state appeal board before filing a petition in the district court. *Drahaus v. State*, 584 N.W.2d 270, 272–73 (Iowa 1998); *In re Estate of Voss*, 553 N.W.2d 878, 880 (Iowa 1996). "Improper presentment of a claim, or not presenting one at all, has been considered a failure to exhaust one's administrative remedies, depriving the district court of subject matter jurisdiction." *Voss*, 553 N.W.2d at 880. If a court lacks jurisdiction when a suit is filed, then the court must dismiss the suit. *Feltes*, 385 N.W.2d at 549.

Minor and D.A. did not file a claim against Hester with the state appeal board. At best, Minor and D.A. raised their claims against Hester for the first time in the district court. Thus, Minor and D.A. failed to exhaust the administrative remedy available to them. Accordingly, we must affirm the granting of summary judgment in favor of Hester on the state tort claims because the court lacks jurisdiction to hear them.

---

[8]The legislature amended section 669.5 in 2006 to preclude the filing of a suit until the attorney general has the opportunity to make a final disposition of the claim. 2006 Iowa Acts ch. 1185, § 107.

[9]The legislature also amended section 669.13 in 2006 to provide that a party must submit his or her claim or suit in writing to the director of the department of management within two years. *Id.* § 108.

2. *Whether Grabe is entitled to immunity under the intentional tort exception.* Minor and D.A. assert claims against Grabe for intentional infliction of emotional distress and tortious interference with the parent–child relationship, for which Minor maintains our prior decisions have recognized a cause of action. The district court determined Grabe was immune from these claims based on Iowa Code section 669.14(4), which provides an exception to state tort liability for claims arising out of certain intentional torts. We conclude the district court was correct.

On appeal, Minor and D.A. assert for the first time that Grabe did not raise section 669.14(4) as a defense more than sixty days before the date set for trial, as required by Iowa Rule of Civil Procedure 1.981. Minor and D.A. also claim for the first time on appeal that, because Grabe first raised the argument in a reply brief filed in the district court, her due process rights were violated because she did not have the opportunity to respond to the argument. Minor and D.A., however, did not raise these arguments in the district court. Therefore, we cannot evaluate these arguments because it is unfair for us to consider an argument the trial court did not have an opportunity to consider. *See DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002).

Section 669.14(4), commonly referred to as the intentional tort exception, provides that the State's waiver of sovereign immunity from tort claims does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Iowa Code § 669.14(4). We construe this exception narrowly. *Walker v. State*, 801 N.W.2d 548, 567 (Iowa 2011). Further, because the legislature intended the ITCA to have the same effect as the Federal Tort

Claims Act (FTCA), we give great weight to relevant federal decisions interpreting the FTCA.[10] *Feltes*, 385 N.W.2d at 547.

We have interpreted this section as a list of "excluded claims in terms of the type of wrong inflicted." *Greene v. Friend of Ct., Polk Cnty.*, 406 N.W.2d 433, 436 (Iowa 1987); *accord Hawkeye By-Prods., Inc. v. State*, 419 N.W.2d 410, 411 (Iowa 1988). Therefore, where the basis of the plaintiff's claim is the functional equivalent of a cause of action listed in section 669.14(4), the government official is immune. *Trobaugh v. Sondag*, 668 N.W.2d 577, 584 (Iowa 2003); *JBP Acquisitions, LP v. U.S. ex rel. F.D.I.C.*, 224 F.3d 1260, 1264 (11th Cir. 2000) (" 'It is the substance of the claim and not the language used in stating it which controls' whether the claim is barred by an FTCA exception." (citation omitted)). There must be more than "[a] mere conceivable similarity" in order to establish "the nexus of functional equivalency" between the claimed tort and the type of wrong listed under section 669.14(4). *Trobaugh*, 668 N.W.2d at 585. Consequently, a defendant may successfully assert section 669.14(4) as a defense even though the tort complained of is not itself listed in section 669.14(4).

Although we held in *Dickerson* that state employees are not entitled to an exception to the waiver of sovereign immunity under section 669.14 when the plaintiff asserts a claim for intentional infliction of emotional distress, we nonetheless noted the defendants did not argue the

---

[10]The analogous section of the Federal Tort Claims Act provides: "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution." 28 U.S.C. § 2680(h) (2000).

exceptions listed in section 669.14(4) included intentional infliction of emotional distress. 547 N.W.2d at 213–14. Here, Grabe argues the alleged conduct underlying Minor's claims for intentional infliction of emotional distress and tortious interference with the parent–child relationship, if true, would amount to conduct listed in section 669.14(4), specifically misrepresentation and deceit. Therefore, we need to determine whether the basis of Minor and D.A.'s claims of intentional infliction of emotional distress and tortious interference with the parent–child relationship is the functional equivalent of misrepresentation or deceit.

We have examined the deceit exception before. In *Saxton v. State,* 206 N.W.2d 85 (Iowa 1973), we found the basis of the plaintiff's complaint was functionally equivalent to deceit where the complaint alleged the department of agriculture intentionally concealed a veterinary diagnosis from the plaintiff. 206 N.W.2d at 86. In *Hawkeye By-Products,* we determined the basis of the plaintiff's complaint was the functional equivalent of misrepresentation, deceit, and interference with contract rights because the complaint alleged the department of agriculture either recklessly or negligently made assurances to the plaintiff "in a manner calculated to produce detrimental reliance on their part." 419 N.W.2d at 411.

We have also examined the misrepresentation exception. In *Hubbard v. State,* 163 N.W.2d 904 (Iowa 1969), we held the misrepresentation exception barred a plaintiff's claim that the State negligently diagnosed the plaintiff's herd with a disease even though they were not so infected. 163 N.W.2d at 905, 912. In *Adam v. Mount Pleasant Bank & Trust Co.,* 340 N.W.2d 251 (Iowa 1983), where farmers alleged they lost grain because the Iowa State Commerce Commission

negligently licensed an insolvent grain company, we determined the misrepresentation exception applies if the alleged damages were caused by a negligent communication of information. 340 N.W.2d at 251, 253. In doing so, we stated, " 'the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies.' " *Id.* (quoting *Block v. Neal*, 460 U.S. 289, 296, 103 S. Ct. 1089, 1093, 75 L. Ed. 2d 67, 74 (1983)).

In this case, Minor and D.A. allege Grabe was the unidentified DHS employee who called Pena and coerced her to give information on Minor and D.A. in exchange for favorable treatment. They allege Grabe included the information obtained through coercion in her affidavits. Further, Minor and D.A. claim the information in Grabe's affidavits was false. All of this, Minor and D.A. allege, led to the removal order placing D.A. in a foster home where D.A. was allegedly abused, neglected, improperly supervised, subjected to unsanitary conditions, and denied proper medical care. Minor and D.A. contend Grabe intentionally took these actions in order to investigate Minor to remove D.A. from Minor's care, custody, and control. In other words, the basis of their claim is that, to intentionally inflict emotional distress and interfere with their parent–child relationship, Grabe obtained false information from Pena, communicated the false information to the district court, and the district court relied on it in deciding to remove D.A. from Minor's custody. The district court concluded this fell within the deceit and misrepresentation categories of section 669.14(4). We agree.

In all of the cases above, the misrepresentation or deceit exception applied because the government provided misleading information to or concealed information from the plaintiff. This situation differs from the other cases because Minor was not the party alleged to have been

deceived or the recipient of misleading information. However, in interpreting the FTCA's misrepresentation exception, federal circuits have held it does not matter whether the misrepresentation giving rise to a plaintiff's claim was made to the plaintiff or a third party. *See, e.g., JBP Acquisitions*, 224 F.3d at 1266; *see also Schneider v. United States*, 936 F.2d 956, 960 (7th Cir. 1991) (holding the misrepresentation exception barred plaintiffs' claims based on the government's misrepresentation to a private builder from whom the plaintiffs purchased their homes); *Baroni v. United States*, 662 F.2d 287, 288–89 (5th Cir. 1981) (holding the misrepresentation exception barred plaintiffs' claims where the government made a misrepresentation to a real estate developer and not to the plaintiffs). This principle makes sense because the basis of Minor's claims would not exist but for Grabe's alleged misrepresentation to the juvenile court. Further, we find the reasoning underlying this principle equally applicable to the deceit exception. Therefore, we hold the district court correctly granted summary judgment in favor of Grabe because the basis of her complaint is the functional equivalent of misrepresentation and deceit.

**V. Disposition.**

We conclude Grabe is entitled to absolute immunity from liability under 42 U.S.C. § 1983 for her involvement in causing the county attorney to file the CINA petition and when she acted as an ordinary witness in filing an affidavit requesting the court grant temporary custody to DHS. Grabe is not entitled to absolute immunity for her investigatory acts or the act of filing of the affidavit as a complaining witness. Likewise, Hester is not entitled to absolute immunity under § 1983. However, Grabe is entitled to qualified immunity under § 1983 for her investigatory acts and the filing of the affidavit as a complaining

witness and Hester is entitled to qualified immunity under § 1983 for his acts because Minor and D.A. have failed to present a genuine issue of material fact as to whether either violated their clearly established constitutional rights. Moreover, the court lacks subject matter jurisdiction to hear state tort claims against Hester under the ITCA. Finally, the plaintiffs cannot maintain an action against Grabe under the ITCA because the basis of the complaint against Grabe is the functional equivalent of misrepresentation and deceit. Therefore, we affirm the entry of summary judgment by the district court.

**AFFIRMED.**